[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 8, 2005
THOMAS K. KAHN
CLERK

No. 04-15090
Non-Argument Calendar
_____

D. C. Docket No. 02-00106-CV-WBH-1

BRIAN MORRIS,

Plaintiff-Appellant,

versus

EMORY CLINIC, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(March 8, 2005)**

Before BLACK, PRYOR and GODBOLD, Circuit Judges.

PER CURIAM:

This is an employment discrimination case brought by a male doctor, an obstetrician and gynecologist, against his employer, a medical school clinic, for age and sex discrimination. The doctor claims the university clinic fired him because it favored younger female doctors. The clinic asserts that the doctor was terminated as a result of patient complaints concerning his forceful physical examinations and off-color remarks he made on the ability of older patients to have children. The district court granted summary judgement for the university clinic. We affirm.

Dr. Brian Morris' tenure with Emory University School of Medicine began in 1995 when he was appointed to the faculty as an assistant professor. Along with his faculty appointment Morris was to work as an obstetrician and gynecologist at one of the University's Clinic locations around the Atlanta metropolitan area. Morris initially was assigned to the Clinic's location in nearby Fayetteville, Georgia. His employment was subject to termination by the University for any reason upon 90 days written notice. His supervisor at the Clinic was Dr. Penny Castellano who headed the Clinic's obstetrics and gynecology section.

In 2000 the University closed its Fayetteville Clinic location for financial reasons. Morris was reassigned to the Clinic's Crawford Long location, a large

2

facility in Midtown Atlanta named after a prominent Georgia physician.  He was also assigned to perform "back up" duties at the Clinic location on Clifton Road. The Clifton Road facility was located a short distance away from Crawford Long on the University's Medical School campus.  Morris asserts – without explanation – that the Clifton Road location was favorable to Crawford Long.  Morris submitted evidence that the Clinic ensured that both female and male doctors were located at the Clifton Road location.  One administrator speculated that a reason for balancing the male to female physician ratio at a Clinic location was that some female patients might prefer to see female gynecologists.  Both the Crawford Long and Clifton Road locations had male and female doctors.

After Morris moved to Crawford Long, he received a series of patient complaints that alleged he conducted forceful physical examinations and made disparaging remarks to patients over 40 seeking to have children.  In March 2000 a patient called the Clinic to complain that, in response to her question whether the examination of her cervix would hurt, Morris "dug his nails into her ankle and asked her what she would say if something hurt."  As Morris' supervisor Castellano was charged with investigating this complaint.  She met with Morris to discuss the incident and informed him that she would raise the matter with Clinic administration personnel.

In December 2000 another patient wrote a letter criticizing the "forceful" and "rough manner" in which Morris conducted her examination. She also described several off-color remarks Morris made about her chances for pregnancy given her age. The patient wrote that Morris told her "the realities are that you have 42-year-old eggs, which means that it will be difficult for you to get pregnant." When she informed him that another physician in Washington, D.C. had success with pregnancies in women over the age of 40, Morris retorted "it does not change the statistics that you only have a 50% chance of getting pregnant." Morris recommended the patient see a fertility clinic to potentially qualify to receive an egg from a younger female. The patient wrote in her letter that she felt Morris had an underlying resentment of women who chose to postpone motherhood in favor of pursuing a career.

After receiving the letter Castellano and Paul Hammonds, Administrator of Primary Care, met with Morris to discuss the patient's complaints. During this meeting Castellano requested that Morris write a letter of apology to the patient. Castellano also suggested Morris view a video on patient care and advise her after he had viewed the tape. A letter of apology was drafted by Castellano and signed by Morris. Morris conceded that he may have been "less sensitive to the woman's needs that day" but felt that the patient had "overreacted." The tape was later sent

4

to Morris' residence with what Morris viewed as a threatening note which he interpreted to mean "fly straight or you are going to be fired." Morris never reported to Castellano that he had viewed the tape.

Around the same period the Clinic sought to increase the number of physicians on staff. In February 2001 the Clinic made a job offer to Dr. Leslie Choy-Hee, a female physician in the residence program at the University's School of Medicine. The Clinic also extended an offer to Dr. Todd Bashuk, a male resident in the same program.

Two months later, in April 2001, another patient complained about Morris' harsh treatment of her during a physical examination which she characterized as "degrading." The patient complained that Morris had an "animosity toward women" and that his physical examination was "unnecessarily forceful compared to other pelvic exams she has had." She was ten weeks pregnant and complained that because she was 39 years old, had experienced one miscarriage, and an ovarian cyst, Morris informed her that she was the perfect candidate for follow-up with a mid-wife. When she expressed opposition to this idea he informed her that "this is not your call."

As evidence of the unnecessary force used during the examination the patient stated that she had been instructed by an assistant not to remove her bra

prior to the examination. When Morris entered the examination room, however, and discovered the patient was wearing a bra, he became upset and "ripped it over her head." Morris disputed that he ripped off the patient's bra and speculated that he may have assisted her if she appeared to be struggling with removing it. This patient also complained that during the April visit Morris neglected to listen for the fetal heartbeat as was customarily done by an obstetrician. A few days after her examination she suffered a miscarriage and was told by an examining physician that the fetus was probably dead when she was examined by Morris. The physician noted that if Morris had listened for the heartbeat he would have detected the problem.

Her complaint however was not limited to Morris. The patient also complained that after her examination by Morris, while she was out of town she called the Clinic for a referral for her sister's obstetrician and spoke with Dr. Jessica Arluck. The patient thought she was having a miscarriage and did not want to go to the emergency room. She felt that Arluck was insensitive because she responded to her request for a referral with "no – I'm at home, either call the office or your insurance company." The Clinic did not view the patient's complaint against Arluck in the same light as her allegations against Morris.

Castellano was alarmed by the allegation concerning the bra and suggestion that the patient see a midwife against her wishes – particularly in light of the prior complaints. She began discussing firing Morris with the other physicians at the Clinic including Dr. Arluck. Arluck volunteered that she "wanted [Morris] out of the practice" because of the continuing problem with Morris' treatment of his patients. She indicated that the practice group at the Clinic would rather work harder than have Morris damage the reputation of the Clinic.

In May 2001 Castellano and Hammonds met with Morris and informed him that he was being placed on administrative leave. Morris understood that this action was undertaken so that the Clinic could conduct an investigation into the complaints. He maintains that he was not provided with specific details of the undergarment incident. Following this meeting a letter was sent to Morris. It stated that Morris was placed "on an Administrative Leave of Absence (with pay) pending further investigation." After the meeting Castellano spoke with different physicians and administrators regarding the complaints against Morris and his treatment of his patients.

Two weeks later Castellano and Hammonds met with Morris again. According to them, during this meeting they presented Morris with an overview of the two most recent complaints against him and provided him with an opportunity

7

to rebut any of the allegations.  Morris says that this meeting did not provide any meaningful opportunity to explore the allegations and that he did not comment on the complaints at the meeting.  Castellano offered Morris the option of resigning rather than having the Clinic terminate his employment.  Morris opted not to resign.  As a consequence, Castellano sent Morris a letter dated May 25, 2001 providing him with 90 days notice of his termination pursuant to the employment agreement.  It stated that Morris' employment with the Clinic was terminated effective August 23, 2001 and that he would remain on administrative leave until that date.  Until this time he would continue to receive his salary but could not see any patients at the Clinic.

During the summer of 2001 both Bashuk and Choy-Hee accepted their employment offers and began working at the Clinic.  Choy-Hee started on August 1, 2001, over two months after Morris' discharge.  She split her time between Crawford Long and Clifton Road.  Morris contends that the majority of her time was spent at Clifton Road.  Bashuk began working on July 15, 2001.  He also practiced at Clifton Road and another facility, the Perimeter location.  The Perimeter location later closed because the University downsized the number of Clinic locations.  For a brief period following the closure Bashuk worked at Clifton Road before he ultimately resigned.

After his termination Morris sued the Clinic for employment discrimination under federal and state law including Title VII and the Age Discrimination in Employment Act (ADEA). He contends that the Clinic discriminated against him on the basis of both his sex and age when it terminated his employment and hired Choy-Hee, a younger female. He also avers that the Clinic responded more aggressively to patient complaints against him because he was an older male than it did to similar complaints against other younger female physicians. The complaints he identified however generally involved administrative failures (e.g., failure to return phone calls, lack of promptness in examining a patient, difficulty in obtaining an appointment) or allegations of negligence in connection with a medical procedure.

A magistrate judge in a detailed and lengthy order issued a report and recommendation granting summary judgment to the Clinic on the federal claims and dismissing the state claims. The magistrate judge held that Choy-Hee was hired for a different location and therefore did not replace Morris. He also held that Morris failed to identify similar complaints lodged against other physicians who were treated favorably compared to him. Morris objected to the magistrate judge's order. The district court agreed with the magistrate judge and adopted his report and recommendation. This appeal followed. We affirm.

We review *de novo* a district court's order granting a motion for summary judgment and construe "all reasonable doubts about the facts in favor of the non-movant." Browning v. Peyton, 918 F.2d 1516, 1520 (11th Cir. 1990). Summary judgment is only appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Discrimination on the basis of an individual's sex or age is unlawful. 42 U.S.C. § 2000e-2; 29 U.S.C. § 623(a). The critical question for us is whether Morris created a genuine issue of material fact concerning whether his termination was lawful. See Wright v. Southland Corp., 187 F.3d 1287, 1289 (11th Cir. 1999). Put differently, did the Clinic discriminate against Morris on the basis of his sex or age or were its actions the lawful result of patient complaints?

As we held in Wright Morris can avoid summary judgment in one of two ways. See id. at 1290. He can use the traditional framework and use direct evidence to create a triable issue of whether he was fired or treated less favorably because he was an older male. See id. at 1291-92. Direct evidence is "evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir.

10

2004) (internal citation omitted).   Or he can use the <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973) framework.

<u>McDonnell Douglas</u> places a burden of production on the Clinic if Morris can show that he was terminated or treated less favorably because of his age or sex.  See <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506-7 (1993).  Our inquiry under <u>McDonnell Douglas</u> consists of three steps.  First, Morris must first present evidence that he was qualified to work at the Clinic and that he lost his position to, or was otherwise treated less favorably than a younger female physician.  <u>See</u> <u>Wright</u>, 187 F.3d at 1290-91. If he does this, the burden then shifts to the Clinic to offer a nondiscriminatory reason for its actions - the second step.  <u>See id</u>.  If the Clinic fails to offer a legitimate explanation for its actions, Morris is entitled to a judgment as a matter of law.  <u>See id</u>.  If however the Clinic offers a legitimate explanation then Morris must take the third step.  He must show the explanation is inadequate, a mere pretext.  <u>See id</u>.  The result of this three step dance is that the burden is always on plaintiff to show that defendant's action is discriminatory. See  <u>Hawkins v. Ceco Corp.</u>, 883 F.2d 977, 981 (11th Cir. 1989).

Under either the traditional method or the <u>McDonnell Douglas</u> framework, Morris' employment discrimination claim is without merit.  He has no evidence that age or sex played any role in the Clinic's determination to terminate his

11

employment.  Rather than confront this deficiency in his case, on appeal Morris cites several positive reviews he received while employed with the Clinic to show that his dismissal was unwarranted.  Our task however is not to second-guess whether terminating Morris was a good or bad business decision by the Clinic.  Our review is limited to whether the Clinic has used age or sex as a basis to terminate him or treat him less favorably.

Sex Discrimination

Morris' allegations of direct evidence are unsupportable.  He asserts that the Clinic's preference for a certain ratio of females to males at the Clifton Road location shows direct evidence of discrimination against males.  Without this preference, Morris alleges that he would have been able to work at Clifton Road.  Morris cites  numerous employment cases involving defendants making discriminatory statements to the plaintiff to support his position.  See, e.g., Lindsey v. Am. Cast Iron Pipe Co., 772 F.2d 799, 802 (11th Cir. 1985) (statement that employer looking for "younger person"), Burns v. Gadsen State Cmty. Coll., 908 F.2d 1512, 1518 (11th Cir. 1990) (statement that no woman would be named to position).

The Clinic however did not make such a statement.  To the contrary, other males worked at the Clifton Road location and at least one other male physician,

12

Bashuk, was hired to perform duties there. The district court correctly concluded Morris failed to present any direct evidence of unlawful sex discrimination.

The McDonnell Douglas framework is unhelpful to Morris. A plaintiff does not shift the burden to the defendant under McDonnell Douglas merely by stating that he was fired or treated unfavorably. McDonnell Douglas requires the plaintiff to establish a prima facie case which includes identifying an individual who replaced him or was treated better than he was who was not a member of his protected class (here an older male). See Hawkins, 883 F.2d at 982. When evaluating a replacement we have stated "[w]here the employee's position is clearly delineated and responsibilities are well defined, the court should focus on the person that physically replaced the employee or consider whether that job title was actually filled." Id. Only after the plaintiff has made his prima facie case does the burden shift to the defendant.

Morris never makes it past the first step of McDonnell Douglas. He has not identified any female physician who replaced him. He claims that he was replaced by Choy-Hee, but the undisputed evidence shows that she was hired for the Clifton Road location several months before the Clinic decided to terminate Morris. Morris also fails to identify a female physician who received similar complaints concerning off-color remarks about her patients' ability to have children and who

13

was accused of conducting forceful physical examinations who was not terminated (or received favorable treatment). Without showing that a comparable female received "nearly identical" complaints, we cannot adequately compare the Clinic's actions towards Morris and other female physicians. See Maniccia v. Brown, 171 F.3d 1364, 1368-69 (11th Cir. 1999). Finally Morris fails to explain how he is disadvantaged by working at Crawford Long as opposed to Clifton Road. We have identified no meaningful way to distinguish the two other than geography. Accordingly the Clinic's placement of Morris at the Crawford Long location is not circumstantial evidence of discrimination.

Under the traditional framework or McDonnell Douglas, Morris cannot connect his termination to his sex. Because Morris has not presented sufficient evidence that he was treated less favorably than a female worker, we need not evaluate the Clinic's burden of production under the McDonnell Douglas framework.

Age Discrimination

Morris failed to present any evidence of age discrimination - direct or indirect using McDonnell Douglas. See Carter v. City of Miami, 870 F.2d 578, 582 (11th Cir. 1989) (applying McDonnell Douglas framework to age discrimination claim). He did not identify a younger physician who replaced him.

14

He also failed to show that any younger physician who received nearly identical complaints was treated better than he was. Therefore the district court did not err in dismissing this claim.

The district court adopted the magistrate's ruling that because Morris was not 40 years of age at the time of his termination, he was not within the class of persons protected by the ADEA. We may agree with that legal principle, see 29 U.S.C. § 631, however we have identified nothing in the record to suggest that Morris was under 40 years old at the time of his termination. While few people would view Morris, aged 40, as old in relation to a person in mid to late 30s such as Choy-Hee, we need not address this issue.

Health Care Quality Improvement Act

Morris invokes the Health Care Quality Improvement Act (HCQIA) to show that the Clinic's failure to adequately conduct an investigation before his termination is evidence of employment discrimination. Indeed he carefully outlines the hospital's alleged failure to follow its own internal procedures and other guidelines in its investigation and his termination. The HCQIA directs that a hospital investigating one of its physicians report the results of its inquiry to the national data bank. See 42 U.S.C. § 11133. Hospitals have immunity from liability for complying with this statute unless the report filed is knowingly false.

15

See 42 U.S.C. § 11137(c). There is no express private right of action under the HCQIA.

At bottom Morris' HCQIA claim is really about the Clinic allegedly not conducting a full and thorough investigation before terminating him. While Morris disputes the characterization of the patient complaints and the adequacy of the Clinic's investigation, without showing that sex or age played a role in his termination he has no employment discrimination case.

This is not to say he is without legal recourse if the hospital in fact arbitrarily revoked his staff privileges in violation of its bylaws. Under Georgia law a physician may have a cause of action for a hospital's revocation of staff privileges without substantially complying with its bylaws. See O.C.G.A. § 51-1-6; Lee v. Hosp. Auth., __ F.3d __, 2005 WL 172159 (11th Cir. Jan. 27, 2005). Morris however has not alleged a cause of action under Georgia state law against the Clinic for failure to comply with its bylaws in his termination as in Lee. Our review therefore is limited to Morris' legally insufficient discrimination claim.

AFFIRMED.