HUGHES, J.
|,We granted certiorari in this case to review a damage award of nearly $3 million in favor of a surgeon for alleged improprieties in peer review proceedings. At issue in this case are: the Health Care Quality Improvement Act of 1986 (“HCQIA”), 42 U.S.C.A. § 11101 et seq.; Louisiana’s peer review immunity statute, LSA-R.S. 13:3715.3(0; and Louisiana contract and negligent misrepresentation laws. For the reasons assigned, we affirm in part, reverse in part, and vacate in part.
FACTS AND PROCEDURAL HISTORY
At all pertinent times, the plaintiff, Dr. Tommie M. Granger, was a board-certified cardiac surgeon practicing in Alexandria, Louisiana, having hospital privileges as a member of the medical staff at CHRIS-TUS St. Frances Cabrini Hospital (“Cabrini”), also located in Alexandria. Dr. Gran-ger maintained his private practice through a limited liability medical company, Cardiovascular Surgery of Alexandria, L.L.C. (“CSA”), of which he was the sole shareholder. Dr. Granger was also, at the time, Medical Director for Cardiovascular Services at another local hospital, Rapides Regional Medical Center (“Rapides”).
|20n December 18, 2002, a patient of Dr. Granger’s was hospitalized at Cabrini following a surgical procedure[1] and suffered *741 complications, which resulted in Dr. Gran-ger being called back from Rapides to Cabrini to attend the patient.[2] While he was at Cabrini attending his patient, heated words were exchanged between Dr. Granger and certain Cabrini staff members, with Dr. Granger casting aspersions on the care given by the Cabrini nursing staff, allegedly within the hearing of the patient. After Dr. Granger performed an in-room procedure to |salleviate a hemato-ma that had developed at the surgery site, he ordered the patient transferred to the intensive care unit, and then he left Cabrini to return to his Rapides surgical patient. Dr. Granger stated that, while driving back to Rapides, he telephoned Cabrini to reserve surgical facilities so that, later that day, he could perform exploratory surgery to determine the cause of the bleeding at the Cabrini patient’s surgical site. However, the Cabrini patient’s condition deteriorated prior to the completion of Dr. Gran-ger’s Rapides surgery, and Dr. Granger was called by Dr. Michael Finley (Cabrini’s Chief Medical Executive (“CME”)) and informed that his Cabrini patient had developed uncontrolled bleeding, which need *742 ed immediate surgery. Unable to leave his Rapides patient during surgery, Dr. Granger contacted Dr. Phillip Lindsay, who agreed to perform the exploratory surgery on Dr. Granger’s Cabrini patient to locate and repair the source of the bleeding.
Later in the day, an anesthesiologist assigned to participate in the coronary bypass surgery on Dr. Granger’s Cabrini patient, scheduled for the following day, can-celled the bypass surgery. Dr. Granger disagreed with the cancellation and further heated discussions ensued relating to the patient’s care.[3]
On December 19, 2002 and continuing through June of 2003, peer review proceedings were undertaken by Cabrini’s Board of Directors (the “Board”), the Board’s Executive Committee (“BEC”), and the Medical Executive Committee (“MEC”). Initially, Dr. Granger was immediately and summarily suspended for approximately twenty-one days while an investigation was conducted with respect to the care of Dr. Granger’s Cabrini patient on December 18, 2002. On January 10, 2003, Dr. Granger’s clinical privileges were restored, but a letter of reprimand was placed in his permanent Cabrini record. Although Dr. Granger requested that the letter of reprimand be removed from his record or that a hearing be granted on [4the summary suspension, his request was denied. Finding that the unprofessional behavior of Dr. Granger was a contributing factor that adversely affected patient care, the MEC made a recommendation and the BEC passed a resolution to place Dr. Granger on a six-month supervised probation and to require him to self-refer to the Physician’s Health Foundation of Louisiana (“PHFL”)[4] for an anger management evaluation, failing which his medical staff membership and clinical privileges would be automatically revoked. Dr. Granger did not self-refer to the PHFL, and, ultimately, on July 30, 2003, the Board voted to ratify the BEC’s resolution to automatically revoke Dr. Granger’s medical staff membership and clinical privileges.
In the interim, on February 6, 2003, Dr. Granger filed suit in the district court seeking declaratory and injunctive relief on his asserted right to a hearing on the December 19, 2002 through January 9, 2003 summary suspension imposed by Cabrini. Named as defendants were: CHRISTUS Health Central Louisiana d/b/a CHRISTUS St. Francis Cabrini Hospital; CHRISTUS St. Francis Cabrini Hospital Medical Staff; and the Local Governing Board of CHRISTUS St. Frances Cabrini Hospital. Dr. Granger filed amendments to his petition, on June 24, 2003 and June 8, 2010, to assert additional claims for Cabrini’s revocation of his clinical privileges, bad faith breach of contract under its “Bylaws of the Medical Staff’ (2002 edition) (“Bylaws”), defamation, unfair and deceptive trade practices, negligent misrepresentation, fraud, and damages and attorney fees under LSA-R.S. 51:1409 of Louisiana’s Unfair Trade Practices and Consumer Protection Act (“LUT-PA”). A stipulation was subsequently entered into by the parties, stating:[5]
*743 fcl) CHRISTUS St. Frances Cabrini Hospital will not distribute or disseminate the letters of April 7 and June 16, 2003, to any healthcare organization, entity, or insurer.
2) CHRISTUS St. Frances Cabrini Hospital will not take any further adverse action regarding Dr. Gran-ger’s former privileges at CHRIS-TUS St. Frances Cabrini Hospital. Dr. Granger will not reapply for medical staff privileges during the pen-dency of this action.
3) If questioned by any licensing or credentialing entity concerning the summary suspension of December 19, 2002 to January 10, 2003, CHRIS-TUS St. Frances Cabrini Hospital shall reply: “Dr. Granger was summarily suspended on December 19, 2002. An ad hoc committee investigated the incident. Dr. Granger was restored to full medical staff privileges on January 10, 2003.”
4) If questioned by any licensing or credentialing entity concerning Dr. Granger’s medical staff status, CHRISTUS St. Frances Cabrini Hospital will reply: “Members of the medical staff are appointed for two-year terms. Dr. Granger’s last appointment expired July 31, 2003. He did not apply for renewal of his former privileges in the Section of Surgery.”
5) The stipulation between the parties is irrevocable unless withdrawn or modified with prior court approval.
Thereafter, on September 10, 2007, the trial court rendered a partial summary judgment, ruling that Cabrini was immune from liability, pursuant to HCQIA, for “monetary damages” for the allegedly improper December 19, 2002 summary suspension of Dr. Granger’s hospital privileges. The trial court declined to render summary judgment in favor of Cabrini to find HCQIA immunity as to Dr. Granger’s remaining claims. Subsequent defense motions for partial summary judgment on the LUTPA, breach of contract, and defamation claims were denied in June of 2010.
A nine-day jury trial was held in June and July of 2010, during which the trial court dismissed Dr. Granger’s claims for defamation and fraud sua sponte. After deliberations, the jury answered jury interrogatories as follows:
|fil. Do you find that Cabrini Hospital took peer review action, without malice, and in the reasonable belief that such action was warranted by the known facts?
YES_NO j_
If you answer ‘TES” to this question, do not answer any more questions, sign this verdict form and return to the courtroom. If you answer “NO” to this question, go to question number 2.
2. Do you find that Cabrini Hospital’s peer review action regarding Dr. Granger was taken in the reasonable belief that the action was in the furtherance of quality health care?
YES_NO J_
If you answer ‘TES” to this question, go to question number 3. If you answer “NO,” to this question, go to question number 6.
*744 6. Do you find by a preponderance of the evidence that Cabrini failed to substantially comply with the hospital’s bylaws in the peer review proceeding?
YES J_ NO_
If you answer ‘YES” to this question, go to question number 7. If you answer “NO,” go to question number 8.
7. Do you find by a preponderance of the evidence that such conduct by Cabrini Hospital caused revocation of Dr. Granger’s privilege^] at Cabrini Hospital?
YES J_ NO_
After you answer this question go to question number 8.
8. Do you find by a preponderance of the evidence that Cabrini Hospital, in its peer review action, engaged in unfair or deceptive trade practice(s) against Dr. Granger?
YES NO_
If you answer “YES” to this question, go to question number 9. If you answer “NO” to this question, go to question number 10.
9. Do you find by a preponderance of the evidence that such conduct caused Dr. Granger harm?
|7YES J_ NO_
After you answer this question, go to question number 10.
10. Do you find by a preponderance of the evidence that Cabrini Hospital, in its peer review action, made negligent misrepresentation(s) to or concerning Dr. Granger?
YES NO_
If you answer “YES” to this question, go to question 11. If you answer “NO” to this question, go to question number 12.
11. Do you find by a preponderance of the evidence that such negligent misrepresentation(s) made by Cabrini Hospital caused harm to Dr. Granger?
YES / NO_
After you answer this question, go to number 12.
12.If you answered question number 7 or 9 or 11 “YES,” what amount of money, if any, do you believe Dr. Granger established by a preponderance of the evidence that he is entitled to because of the conduct of Cabrini Hospital.
Loss of Past Income 2.9 million
Loss of [F]uture [IJneome -0-
General Damages 1 million
On July 16, 2010, the trial judge signed a judgment in favor of Dr. Granger and against CHRISTUS Health Central Louisiana d/b/a CHRISTUS St. Francis Cabrini Hospital, in accordance with the jury verdict, in the total amount of $8,900,000, with judicial interest and all costs.
Cabrini appealed the trial court judgment to the Third Circuit Court of Appeal, asserting: (1) that the trial court erred in failing to find it was entitled to immunity under either HCQIA or the Louisiana peer review immunity statute (contending that: no adverse action was taken by Cabrini against Dr. Granger in the peer review process; its decision to investigate Dr. Granger was objectively reasonable at the time made, to protect patient safety and the quality of medical | scare at the hospital; there was no evidence in the record establishing malice and the lack of a reasonable belief that the peer review of Dr. Granger was in the furtherance of quality health care; the testimony of Dr. Gran-ger’s expert in the field of peer review, Dr. Lawrence Huntoon, should have been excluded by the trial judge; and evidence of damage claims arising from Dr. Granger’s summary suspension should have been ex- *745 eluded by the trial judge); (2) that the trial court erred in failing to grant summary judgment in its favor on Dr. Gran-ger’s LUTPA claims and in the jury’s ruling in Dr. Granger’s favor on the issue (contending that Dr. Granger had no standing to assert the LUTPA claims, that Cabrini had not engaged in unfair or deceptive trade practices, and that there was no evidence establishing that any such conduct had harmed Dr. Granger); (3) that the trial court erred in failing to grant summary judgment in its favor on Dr. Granger’s breach of contact claim and in the jury’s ruling in Dr. Granger’s favor on the issue (contending that the trial judge abused his discretion when he instructed the jury that a contract existed between Dr. Granger and Cabrini, that the evidence did not establish that Cabrini had failed to substantially comply with the alleged contract, and that such alleged failure caused the revocation of Dr. Granger’s privileges at Cabrini); (4) that the trial court erred in failing to grant summary judgment in its favor on Dr. Granger’s negligent misrepresentation claim and in ruling in Dr. Granger’s favor on the issue (contending the trial judge erred in instructing the jury on the issue of negligent misrepresentation and that the evidence did not establish that Cabrini was liable for negligent misrepresentation); and (5) that the trial court erred in finding that Dr. Granger had proved that he was entitled to $3.9 million in damages, that he had been personally damaged by any actions of Cabrini, or that he had suffered any damage (alternatively contending that the failure of the jury verdict to segregate damages attributed to the summary suspension from damages attributed to subsequent Cabrini peer review necessitated that the award be set | naside or the matter remanded to the trial court for a new trial on the issue of damages).
Dr. Granger answered the appeal, contending that the trial court erred: in granting the partial summary judgment in Cabrini’s favor finding that Cabrini was entitled to immunity under HCQIA for the summary suspension of his hospital privileges; and in dismissing sua sponte his claims for defamation and fraud during the jury trial.
On appeal, the Third Circuit found that summary judgment was inappropriate in this case because the issues related to immunity under HCQIA were fact-intensive and there were obvious genuine issues of material fact present, which could only have been resolved at trial; therefore, the appellate court found the trial judge erred in granting a partial summary judgment in favor of Cabrini and dismissing Dr. Gran-ger’s claim for damages based on Cabrini’s actions associated with the initial summary suspension, but did not err in refusing to grant Cabrini’s other motions for summary judgment. The appellate court further found no manifest error in the jury’s factual findings that Cabrini’s peer review: was not without malice; was not taken in a reasonable belief that its action was warranted by the facts known to it; was not taken in the reasonable belief that it was in furtherance of quality health care; and was not in substantial compliance with its own Bylaws. The admission of the expert testimony of Dr. Huntoon on these issues was also found to have been appropriate. The appellate court found no error in the jury’s conclusion that Cabrini was not entitled to immunity under either federal or state law on the claims under its consideration. Further, although the appellate court determined that the trial court’s dismissal of claims arising from the summary suspension was inappropriate on summary judgment, it found the error was harmless because no damages for the summary suspension were warranted based on the facts known to Cabrini at that time (which sug *746 gested that a failure to |10act might have resulted in imminent danger to the health and/or safety of Dr. Granger’s patient). The appellate court also ruled that the trial court properly concluded that the Civil Code requirements for formation of a contract between Cabrini and Dr. Granger had been met considering the medical staff membership approval process and the “undertakings” of Dr. Granger, and that it was implicit in the process that Cabrini would afford staff physicians the procedural protections provided in its Bylaws. The Third Circuit further set aside the jury’s finding of liability under LUTPA, concluding that the peer review proceedings were disciplinary in nature and did not constitute an unfair trade practice. Also, the appellate court found no manifest error in the jury’s conclusion that Cabrini negligently misrepresented its actions to Dr. Granger, when it had a duty to supply correct information to him. And, while the appellate court found the sua sponte dismissal of Dr. Granger’s defamation and fraud claims inappropriate, as there had been no motion for directed verdict by any party, it found no proof in the record of the publication of defamatory remarks or of any fraudulent action by Cabrini. Finding the record complete, no remand was deemed necessary, and the appellate court reduced Dr. Granger’s general damage award from $1,000,000 to $100,000 and his lost wage award of $2,900,000 by $6,000, to $2,894,000 (finding the record did not support the higher awards); thus, Dr. Gran-ger’s total award was reduced from $3,900,000 to $2,994,000.[6] See Granger v. Christus Health Central Louisiana, 2011-85 (La.App. 3 Cir. 7/20/12), 97 So.3d 604.
Cabrini thereafter applied to this court for a writ of certiorari and/or review, which was granted. See Granger v. Chris-tus Health Central Louisiana, 2012-1892 (La.11/21/12), 102 So.3d 49. In brief to this court, Cabrini contends lu the appellate court erred: (1) in failing to distinguish between “peer review activities” and adverse “peer review action,” in determining whether HCQIA immunity applied to preclude Dr. Granger’s damage claim; (2) in holding that the Bylaws created an enforceable contract between the hospital and the physician members of its medical staff, which was breached; (3) in finding that Dr. Granger had stated a claim for negligent misrepresentation, when there was no contractual or fiduciary relationship between Cabrini and Dr. Granger and Dr. Granger had not relied on any alleged misrepresentations made by Cabrini to his detriment; and (4) in allowing Dr. Granger to recover damages, when the damages that were not suffered by him, but rather by his limited liability medical corporation, CSA, and since he made the voluntary decision to withdraw from his practice at Cabrini.
LAW AND ANALYSIS

The Health Care Quality Improvement Act

HCQIA was enacted by Public Law 99-660, based on the following Congressional findings: (1) the increasing occurrence of medical malpractice and the need to improve the quality of medical care have become nationwide problems that warrant greater efforts than those that can be undertaken by any individual state; (2) there is a national need to restrict the ability of incompetent physicians to move from state *747 to state without disclosure or discovery of the physician’s previous damaging or incompetent performance; (3) this nationwide problem can be remedied through effective professional peer review; (4) the threat of private money damage liability under federal laws, including treble damage liability under federal antitrust law, unreasonably discourages physicians from participating in effective professional peer review; and (5) there is an overriding national need to provide incentive and protection for physicians engaging in effective professional peer review. See 42 U.S.C.A. § 11101. See also Poliner v. Texas Health | ^Systems, 537 F.3d 368, 376 (5th Cir. 2008), cert, denied, 555 U.S. 1149,129 S.Ct. 1002,173 L.Ed.2d 315 (2009).
Congress enacted HCQIA to facilitate the frank exchange of information among professionals conducting peer review inquiries and to ensure that some minimal amount of information regarding a physician’s previous damaging or incompetent performance will follow the physician when he moves from state to state. Ming Wei Liu v. Board of Trustees of University of Alabama, 330 Fed.Appx. 775, 779-80 (11th Cir.2009), cert, denied, 558 U.S. 1111, 130 S.Ct. 1053, 175 L.Ed.2d 882 (2010). See also Moore v. Williamsburg Regional Hospital, 560 F.3d 166, 171 (4th Cir.2009), cert, denied, 558 U.S. 875, 130 S.Ct. 201, 175 L.Ed.2d 127 (2009); Poliner v. Texas Health Systems, 537 F.3d at 376. The purpose of this legislation is to improve the quality of medical care by encouraging physicians to identify and discipline other physicians who are incompetent or who engage in unprofessional behavior. Under this law, hospitals and physicians that conduct peer review will be protected from damages in suits by physicians who lose their hospital privileges, provided the peer review actions meet the due process and other standards established in the bill. House Report 99-903 of the Energy and Commerce Committee, 1986 U.S.Code Congressional and Administrative News 6384. HCQIA attempts to balance the chilling effect of litigation on peer review with concerns for protecting physicians improperly subjected to disciplinary action. Accordingly, Congress granted immunity from monetary damages to participants in properly conducted peer review proceedings, while preserving causes of action for injunctive or declaratory relief for aggrieved physicians. Bryan v. James E. Holmes Regional Medical Center, 33 F.3d 1318,1322 (11th Cir.1994), cert, denied, 514 U.S. 1019, 115 S.Ct. 1363, 131 L.Ed.2d 220 (1995).
113HCQIA is required to be applied “to State laws in a State only for professional review actions commenced on or after October 14, 1989.” See Public Law 99-660, Title IV, § 402; 42 U.S.C.A. § 11111(c). HCQIA became effective in Louisiana on July 15, 1988, via 1988 La. Acts, No. 690. Actions in Louisiana pre-dating the effective date of HCQIA were governed solely by this state’s immunity provision, LSA-R.S. 13:3715.3(C). See Smith v. Our Lady of the Lake Hospital, Inc., 93-2512 (La.7/5/94), 639 So.2d 730, 743.[7]
*748 Under HCQIA, there is immunity from liability for damage for professional peer review if a “professional review action” of a “professional review body”[8] meets all the standards specified in Section 11112(a), except in cases involving civil rights. See 42 U.S.C.A. §§ 11101 and 11111(a)(1). A professional review “action” is defined in HCQIA Section 11151(9), which states in pertinent part:
The term “professional review action” means an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct[9] of an individual physician |14 (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects% (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician. Such term includes a formal decision of a professional review body not to take an action or make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action. [Emphasis added.]
In order to obtain the protection provided in Section 11111(a), a professional review action must be taken: (1) in the reasonable belief that the action was in the furtherance of quality health care; (2) after a reasonable effort to obtain the facts of the matter; (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances;[10] and (4) in the reason *749 able belief that the action was warranted 11Rby the facts known, after such reasonable effort to obtain facts and after meeting the notice and hearing requirements. A professional review action shall be presumed to have met the requisite standards, unless the presumption is rebutted by a preponderance of the evidence. See 42 U.S.C.A. § 11112(a).
HCQIA notice and hearing procedures, required by 42 U.S.C.A. § 11112(a)(3) and set forth in 42 U.S.C.A. § 11112(b), are not required: (1) where there is no adverse professional review action taken; or (2) in the case of a suspension or restriction of clinical privileges, for a period of not longer than fourteen days, during which an investigation is being conducted to determine the need for a professional review action. See 42 U.S.C.A. § 11112(c)(1). Further, where an immediate suspension or restriction of clinical privileges is deemed necessary to forestall an imminent danger to the health of any individual, such suspension or restriction of clinical privileges is subject to subsequent notice and hearing or other adequate procedures.[11] See 42 U.S.C.A. § 11112(c)(2).
*750 |16In the instant case, Cabrini attempts to distinguish professional review activity from a professional review action, arguing that its peer review of Dr. Granger constituted only activity and not action, so that HCQIA’s notice and hearing requirements were not implicated. We do not find Cabrini’s argument to be supported by HCQIA’s provisions or the facts of this case.
HCQIA’s immunity provision, 42 U.S.C.A. § 11111, accords immunity only to a professional review action, reading, “If a professional review action (as defined in Section 11151(9) of this title) of a professional review body meets all the standards specified in Section 11112(a),” then the professional review body, “shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action.”[12] (Emphasis added.) Professional review activity is not mentioned in 42 U.S.C.A. § 11111.
HCQIA’s definitional provisions, contained in 42 U.S.C.A. § 11151, make clear the relationship between professional review activity and professional review action. A “professional review action ” is defined as: “an action or recommendation ” of a professional review body that is “taken or made in the conduct of professional review activity.... ” 42 U.S.C.A. § 11151(9) (emphasis added). A “professional review activity” is defined as an “activity” of a “health care entity” with respect to an individual physician “to determine whether the physician may have clinical privileyes with respect to, or membership in, the entity, ... to determine the scope or conditions of such privileges or membership, 117or ... to change or modify such privileges or membership.” 42 U.S.C.A. § 11151(10) (emphasis added).
From these provisions, it is clear that professional review activity is more general in nature than professional review action, and while both encompass review of a physician’s clinical privileges, only a professional review action is expressly defined as adversely affecting, or having the potential to adversely affect, those privileges. Further, when professional review activities are related to a professional review action, then 42 U.S.C.A. § 11151(9) directs that those professional review activities are included in the professional review action and accorded immunity protection. Conversely, it is apparent that professional review activities that are not related to a professional review action are not accorded immunity under Section § 11111, as that section expressly applies only to professional review actions; otherwise, the provision contained in Section § 11151.(9) (making professional review activities related to a professional review action a part of that action) would be rendered superfluous.
Statements found in the Congressional record support this conclusion. HCQIA provides “limited, but essential, protection *751 from liability for persons conducting professional review actions based on the competence or professional conduct of individual physicians.” House Report 99-903 at p. 6391 (emphasis added). “To qualify for the protection, the professional review action must meet the standards specified ... and must be an action as defined in [Section 11151(9) ].” Id. (emphasis added). “If those criteria are met, the persons engaging in or assisting in the conduct of professional review action shall not be liable in damages with respect to the action.” Id. (emphasis added).
We turn now to an examination of the events comprising the Cabrini peer review in this case. Subsequent to the treatment of Dr. Granger’s patient on December 18, 2002, the Cabrini MEC held a meeting on December 19, 2002 and |18voted to suspend Dr. Granger, transfer care of his patients to another doctor, and appoint a subcommittee to investigate Dr. Granger’s actions in the previous day’s patient care. After the December 19, 2002 MEC decision, Dr. Finley (Cabrini’s CME) called Dr. Granger and informed him of the summary suspension and told him not to talk to the patient’s family; he also informed Dr. Gran-ger that the MEC action was based on Dr. Granger’s alleged abandonment of his patient, when he allegedly left Cabrini without fully resolving the post-surgical complication. Also, on December 19, 2002, a letter was sent by Cabrini’s medical staff president (who, at that time, was Dr. David Carlton) to Dr. Granger, informing him of the suspension, that the suspension was based on Article VII, Section 7.5 of the Bylaws,[13] that another doctor would be assigned to his Cabrini patients, that an investigation would be conducted, and that the suspension would remain in force until the matter was resolved.
On December 24, 2002, Dr. Carlton informed Dr. Granger by letter that the initial fourteen-day suspension was being extended for an additional week on account of the holidays and requested that Dr. Granger be available on January 7th or 8th for an interview with the investigating subcommittee. By letter dated December 27, 2002, Dr. Granger’s attorney brought to the attention of Cabrini’s attorney the fact that the investigating subcommittee had imposed the summary suspension without questioning either Dr. Granger or Dr. Lindsay, who had assisted Dr. Granger in caring for his patient on December 18, 2002. The letter further stated that Dr. Lindsay could verify critical facts concerning the propriety of the care administered by Dr. Granger on the date in question and offered to facilitate communications with Dr. Lindsay, further stating that Dr. Granger intended to fully cooperate and requesting that the investigation be expedited. 119Cabrini’s attorney responded by letter on January 2, 2003, stating that a fact finding inquiry was being undertaken by the Cabrini investigating subcommittee, not a formal hearing, and Dr. Granger would be interviewed the following week. Dr. Granger’s attorney then requested, in a January 3, 2003 letter, that he be allowed to accompany Dr. Granger to the interview with the investigating subcommittee. Cabrini’s attorney responded by letter on January 6, 2003, stating that Dr. Granger would not be allowed to be accompanied by counsel during the interview, as it was not considered a formal hearing, and further stating that attorney representation was only allowed under the Bylaws after formal action by *752 the hospital and after a hearing was requested by the physician. Dr. Granger’s attorney submitted another request to allow representation at the interview (to be held January 8, 2003) and asked that, if representation continued to be denied, his objection should be noted in the administrative record.
On January 8, 2003, the MEC subcommittee interviewed: Dr. Granger, Dr. Finley, Barbara Griffin (Cabrini’s Medical Services Director), Dr. Robert Freedman, Dr. Lindsay, and Dr. Joseph G. Patton (the anesthesiologist who assisted Dr. Lindsay in the December 18, 2002 surgery on Dr. Granger’s patient[14]). On January 9, 2003, the MEC met again. The minutes of the meeting reflect that Dr. Finley outlined for the committee the timeline of events leading up to the summary suspension of Dr. Granger related to Dr. Gran-ger’s December 18, 2002 treatment of his Cabrini patient following the earlier carotid endarterectomy. Of concern was whether Dr. Granger acted appropriately, or in disregard of patient care standards, and whether there had been a subsequent abandonment of the patient by Dr. Gran-ger. Also under discussion was whether Dr. Granger had |anexhibited unprofessional behavior, during the incident and at prior times, which presented a pattern of unprofessional behavior and may have resulted in reluctance on the part of the nursing staff to contact Dr. Granger about his patient’s condition. A formal letter of reprimand and a possible probationary period for Dr. Granger were under consideration. After discussion, the MEC voted to recommend: that Dr. Granger be placed on a six-month probation of his medical staff membership and clinical privileges, to encompass both behavior and quality of patient care; that any further “events” during the probationary period be considered grounds for further summary suspension and/or permanent suspension; and that there would be 100 percent chart review conducted by Cabrini’s CME on all of Dr. Granger’s cases during the probationary period.
On January 9, 2003, Dr. Finley addressed a letter to Dr. Granger, stating that the MEC recommended the following: (1) that the summary suspension was appropriate; (2) that the summary suspension expired and Dr. Granger’s clinical privileges were restored, effective January 10, 2003; (3) that, under Article VII, Section 7.3(c) and Appendix A of the Bylaws,[15] the ruling was not appealable; (4) that the “action” was effective immediately; (5) that the “action” was not reportable to the National Practitioner’s Data Bank; and (6) that, following the Governing Board’s action, Dr. Granger would receive “further communication” of the Board’s decision concerning the MEC’s recommendation. Dr. Finley’s letter further stated:
This action is taken because of the committee’s conclusion that you committed a serious error in judgment in your management of your patient on December *753 18, 2002. Although your initial response to the [21 bleeding complication was appropriate in that you examined the patient, opened the wound, evacuated a large hematoma and attempted to control bleeding by packing the wound, leaving this patient, whom you knew to be anticoagulated and who had bled approximately 500 cc prior to your care without any significant period of observation by you, put the patient at significant risk for additional bleeding. In addition, simply ordering him transferred to the ICU without orders to the nursing staff and without arranging for any back up coverage when you knew that you would be in surgery at another hospital and, thus, unavailable for several hours, is below the standards of practice that [Cabrini] expects of its medical staff members.
This letter will become a part of your file and will be reviewed in connection with any future events.
On January 17, 2003, Dr. Granger responded to Dr. Finley’s letter, via his attorney, requesting either that the MEC recall its recommendation regarding the propriety of the summary suspension or comply with Appendix A of the Bylaws, which provided him with a right to a hearing on the summary suspension. The letter also stated that if the MEC’s recommendation were to be adopted by the Board, he would be required to disclose the action if he applied for privileges elsewhere and if asked whether his privileges had ever been suspended for disciplinary reasons. Cabrini informed Dr. Granger’s attorney, through its counsel’s January 29, 2003 letter, that the MEC recommendation was not a final action that would entitle him to a hearing and would not be final until the Board acted upon it; therefore, Dr. Granger’s request for a hearing was denied.
At its January 29, 2003 meeting, the Board ratified the MEC extension of its investigation and summary suspension of Dr. Granger from fourteen days to twenty-one days, and following a summary of the specifics of the case by members of the investigating subcommittee and discussion by the Board, the Board agreed to ask the MEC to investigate further into the matter (apparently rejecting the MEC’s January 9, 2003 recommendations), by: interviewing all nurses involved, considering the unprofessional conduct and behavior as a “key issue,” and making a final recommendation back to the BEC for final action.
| ^During a February 27, 2003 meeting, the MEC voted to recommend that Dr. Granger be placed on a six-month probation and that he be requested to self-refer for an anger management evaluation by the PHFL, within ten days of notification. The minutes of the March 10, 2003 meeting of the BEC reflect that investigating subcommittee members reported on the supplemental investigation, during which other nurses involved in the Dr. Granger patient incident were interviewed. Thereafter, the MEC’s recommendation, that Dr. Granger self-refer to the PHFL “for evaluation” or “risk consideration of further action,” was adopted by the BEC, though the length of time allowed for self-referral was increased from ten to thirty days; the recommendation for a six-month probation was also adopted.
On April 7, 2003, the medical staff president (who, at that time, was Dr. Robin Bennett) and Board chairperson, Nancy Stich, jointly sent Dr. Granger a letter, informing him that the BEC had reviewed the MEC recommendation and pertinent sections of the Bylaws, which addressed expectations as to quality of patient care and professional behavior. Dr. Granger was informed that, considering the MEC’s and the Board’s concern that his unprofes *754 sional behavior was a contributing factor that had adversely affected his Cabrini patient’s care, it approved a recommendation (though the Board did not approve the January 9, 2003 letter of reprimand), which the letter stated was as follows:
RESOLVED, as recommended by the [MEC], that Dr. T. Mack Granger be requested to self-refer to the [PHFL] within 30 days for evaluation and treatment for anger management. Additionally Dr. Granger will be expected to comply fully with any recommendations proposed by the Program, or risk consideration of further action, and, that Dr. Granger be placed on probation for a period of six months. [Emphasis added.[16]]
1an April 30, 2003 meeting, the Board adopted both the February 27, 2003 MEC recommendation and the March 10, 2003 resolution.[17]
On May 27, 2003, a telephone conversation occurred between Dr. Granger and Dr. Bennett, which was recorded by Dr. Granger (without Dr. Bennett’s knowledge). During that conversation, Dr. Granger made the accusation that “this whole thing has been some ruse to get me out” because he had transferred patients from Cabrini to Rapides for allegedly better quality of care. Dr. Bennett responded, “I won’t sit here and tell you that that is not entirely possible as an agenda, as a covert agenda, on the part of the administration .... [I]t would surprise me if that weren’t part of it.” Dr. Bennett went on to say that the patient incident was a “bad event,” and “I think it got pushed into let’s blame somebody. To use the term that I hate from attorneys, rush to judgment, I think it got pushed to that way too quickly. Finding out that the nurses were there and weren’t interviewed and that they didn’t talk to [Dr. Lindsay] until after the fact.” Dr. Bennett further stated, “I don’t know if you’d want to do this, but ... you would just need to resign from the staff, which is part of what they want you to do.”
At a May 29, 2003 meeting of the MEC, it was reported that Dr. Granger had not yet complied with the request to self-refer to the PHFL. Dr. Bennett stated that he had spoken to Dr. Granger and advised him either to self-refer or resign. The MEC voted to recommend that Dr. Gran-ger be sent a notice requiring him to 1 ^self-refer to the PHFL within seven days; otherwise, there would be an automatic termination of his privileges.
On June 6, 2003, the BEC met and passed the following resolution:
RESOLVED, as recommended by the [MEC], that Dr. Tommie Mack Granger *755 be requested to self-refer to the [PHFL] within 7 days, and if enrollment in the program does not occur, his medical staff membership and privileges shall be revoked, is hereby ratified and approved by the members of the [BEC]. [Emphasis added.]
On June 16, 2003, Ms. Stich and Dr. Bennett sent a joint letter to Dr. Granger, requesting him to self-refer to the PHFL within seven days and that, if self-referral did not occur during that time, there would be a recommendation of revocation of his medical staff membership and privileges. If a recommendation of revocation occurred, the letter advised Dr. Granger that he would be notified in writing and of his rights to appeal under Appendix A of the Bylaws. On June 30, 2003, Dr. Finley verified by letter to Cabrini’s CEO that he contacted the PHFL and verified that Dr. Granger had not self-referred for evaluation as requested.
The Board’s July 30, 2003 minutes reflect that Dr. Granger received the hospital’s certified letter requesting that he self-refer to the PHFL, but he had not done so. It was recognized that Dr. Granger’s hospital privileges expired on that day, July 30, 2003,[18] and he had not reapplied. Further, it was noted that the hospital’s attorney advised that no further action should be taken by the Board or the MEC until after the court hearing on Dr. Gran-ger’s request for injunction, scheduled for August. Nevertheless, the Board went on to ratify the prior action by the MEC and BEC, as follows:
RESOLVED, that the recommendations of the [MEC] and the [BEC], as stated in the June 6th, 2003 minutes of the [BEC], are hereby ratified and adopted by the [Board]. [Emphasis added.]
lasThe peer review conducted by Cabrini in this case was considered by the lower courts as having been in two parts: (1) the December 19, 2002 through January 9, 2003 summary suspension of Dr. Granger, and (2) the peer review occurring thereafter, which concluded on July 30, 2003. No finding of liability or award of damages was made by the lower courts for the summary suspension of Dr. Granger from December 19, 2002 through January 9, 2003, and Dr. Granger has filed no application with this court for a writ of certiorari and/or review; therefore, the trial court’s failure to award any damages for the December 19, 2002 through January 9, 2003 period of summary suspension is a final decision.[19]
With respect to immunity issues, the jury found, as reflected by the answers to the jury interrogatories, that: (1) the Cabrini peer review was not taken in the reasonable belief that such action was war *756 ranted by the known facts and was taken with malice; (2) the Cabrini peer review was not taken in the reasonable belief that the action was in the furtherance of quality health care; (3) Cabrini failed to substantially comply with its Bylaws in the peer review proceedings; and (4) Cabrini’s conduct caused revocation of Dr. Granger’s hospital privileges.
With the exception of the revocation of Dr. Granger’s hospital privileges, as discussed hereinafter, we find no manifest error in the factual findings of the jury in this case, as the findings were reasonable in light of the record reviewed in its entirety. See Marcmge v. Custom Metal Fabricators, Inc., 2011-2678 (La.7/2/12), 93 So.3d 1253, 1259 (per curiam). Evidence was presented to the jury in this case upon which it could reasonably have found that other motivations | g4nfluenced the Cabrini peer review, including: an interest by the hospital in deflecting blame for the allegedly negligent care of Dr. Granger’s cardiac patient, who died within a short time of the December 18, 2002 incident; and an interest in discrediting Dr. Granger by a Board member (with whom Dr. Granger had recently terminated his medical association, resulting in a lawsuit filed on December 12, 2002, by Dr. Granger, against the surgical group in which the Board member was a senior partner). It is the role of the factfinder to weigh the respective credibilities of the witnesses, and this court will not second-guess the credibility determinations of the trier of fact. State in Interest of D.M., 2011-2588 (La.6/29/12), 91 So.3d 296, 298 (per cu-riam). In order for this court to overturn a lower court’s finding of fact, there must be “no reasonable factual basis” for the trial court’s conclusions, and the finding must be “clearly wrong.” Kaiser v. Hardin, 2006-2092 (La.4/11/07), 953 So.2d 802, 810 (per curiam). Finding reasonable bases in the record of this case for the factual findings of the jury and no manifest error in those findings, our discussion in this matter is limited to the issues of law presented, with the exception noted.
Our review of the Cabrini peer proceedings as to Dr. Granger reveals that Cabrini failed to comply with HCQIA. Even though we do not review the lower court rulings that found no liability for Cabrini’s initial summary suspension of Dr. Granger,[20] clearly 42 U.S.C.A. § 11112(c)(2) required a post-suspension hearing.
As we indicated hereinabove, under Section 11112(c)(2), an immediate suspension or restriction of clinical privileges is authorized, where the failure to take such an action may result in an imminent danger to the health of any individual, “subject to subsequent notice and hearing or other adequate | ^procedures.” (Emphasis added.) In this case, Dr. Granger requested a post-suspension hearing, but Cabrini refused to accord Dr. Granger a post-suspension hearing, despite also refusing to remove the letter of reprimand placed in Dr. Granger’s Cabrini file, stating that the summary suspension was appropriate.[21] *757 Therefore, Cabrini violated HCQIA by failing to accord Dr. Granger a post-suspension hearing.
Cabrini asserts that, during the post-suspension peer review, since no adverse action was taken against Dr. Granger, pursuant to Section 11112(c)(1)(A) (providing that, for purposes of immunity, nothing in Section 11112 shall be construed as “requiring the procedures referred to in [S]ubseetion (a)(3) of this section” when no adverse professional review action has been taken), it was entitled to immunity under HCQIA. (Emphasis added.) Even if it were true that there had been no adverse action, Section 11112(c)(1)(A) only dispenses with one, namely Subsection (a)(3), of the four requirements imposed by Section 11112(a)(l)-(4);[22] therefore, Cabrini would nevertheless have been required to comply with the remaining three requirements listed in Section 11112(a)(1)— (4) to have acquired immunity. Since only the notice and hearing procedures of Section 11112(a)(3) are excepted when no adverse action has been taken, an entity engaged in peer review is not also excused from compliance with Section 11112(a)(1), (2), and (4).
lajThe jury in this case found as a matter of fact that Cabrini failed to comply with Section 11112(a)(1) and (4); i.e., that Cabrini’s peer review was not taken in the reasonable belief that the action was in the furtherance of quality health care, nor in the reasonable belief that the action was warranted by the known facts. As previously stated, we find no manifest error in these factual findings by the jury.
Cabrini also asserts on appeal that, after the summary suspension, it was conducting professional review activity, not a professional review action. However, by definition, Cabrini’s peer review as to Dr. Granger constituted professional review action. Pursuant to 42 U.S.C.A. § 11151(9), “[t]he term ‘professional review action’ means an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity,” that is “based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician.” (Emphasis added.) As noted hereinabove, we conclude that professional review action is professional review activity that is concerned with the “competence or professional conduct” of a physician and that “affects (or may affect) adversely” the physician’s clinical privileges, or membership in a professional society.
Following the termination of Dr. Gran-ger’s summary suspension and reinstatement of his hospital privileges, effective January 10, 2003, the Cabrini Board, at its January 29, 2003 meeting, directed the MEC to “investigate further” into the December 18, 2003 incident involving Dr. Granger’s Cabrini patient, by interviewing additional nurse witnesses, considering the alleged unprofessional conduct and behavior of Dr. Granger as a “key issue,” and *758 making a final recommendation back to the BEC for final action. Activities of the MEC, BEC, and Board thereafter, through July 30, 2003, were in furtherance of that directive |29and were specifically related to the professional conduct and behavior of Dr. Granger that may have affected his Cabrini patient; these activities (particularly the making of a recommendation) had the potential to adversely affect Dr. Granger’s hospital privileges and membership in Cabrini’s medical staff. See Poliner v. Texas Health Systems, 537 F.3d at 377 (quoting Mathews v. Lancaster General Hospital, 87 F.3d 624, 634 (3rd Cir.1996) (stating that the definition of “professional review action” encompasses decisions or recommendations by peer review bodies that directly curtail a physician’s clinical privileges, or impose some lesser sanction, that may affect adversely a physician’s privileges)).
In this case, both the MEC and BEC concluded that Dr. Granger’s clinical privileges should be automatically revoked unless he submitted himself for anger management treatment with the PHFL, and these recommendations were later ratified by the Board. At the very latest, on the date the decision was first made by the MEC (May 29, 2003) to recommend that Dr. Granger’s clinical privileges be revoked, Dr. Granger was adversely affected,[23] and his right to the due process protections required by 42 U.S.C.A. § 11112 was triggered, including the right to adequate notice and hearing procedures pursuant to Subsection (a)(3). Yet the requisite due process protections were not provided to Dr. Granger. Because Cabrini failed to comply with the HCQIA provisions applicable to its professional review action, Cabrini was not entitled' to HCQIA immunity.
However, HCQIA allows a state to legislate additional immunity for peer review, as stated in 42 U.S.C.A. § 11115(a), which provides:
Except as specifically provided in this subchapter, nothing in this subchapter shall be construed as changing the liabilities or immunities |snunder law or as preempting or overriding any State law which provides incentives, immunities, or protection for those engaged in a professional review action that is in addition to or greater than that provided by this subchapter.
Therefore, we next examine Cabrini’s immunity under Louisiana’s peer review statute.

Louisiana’s Peer Review Statute

The Louisiana peer review statute, LSA-R.S. 13:3715.3(0, provides:
*759 Any hospital committee conducting peer review is entitled to the protection of this statute. See LSA-R.S. 13:3715.3(A)(2).
*758 No member of any such committee designated in Subsection A of this Section or any sponsoring entity, organization, or association on whose behalf the committee is conducting its review shall be liable in damages to any person for any action taken or recommendation made within the scope of the functions of such committee if such committee member acts without malice and in the reasonable belief that such action or recommendation is warranted by the facts known to him. [Emphasis added.]
*759 This court, in Smith, construed LSA-R.S. 13:3715.3(0) as creating an affirmative defense to civil liability for a peer review committee’s (or its members’) actions or recommendations taken in good faith and without malice. Lack of “malice,” and “good faith,” exist in this context when the defendant peer review committee (or a member thereof) is shown to have had a reasonable basis for an action or recommendation made in the course of the peer review process.[24] This standard is consistent with the objective reasonableness standard set forth in the HCQIA counterpart provision. Smith v. Our Lady of the Lake Hospital, Inc., 639 So.2d at 749.
|min determining the applicability of the qualified immunity, a court must engage in a two-step analysis. First, the court must determine whether the defendant is a peer review committee (or a member thereof) and that the actions on which liability is premised were undertaken as part of the peer review process. If so, secondly, it must be determined whether there was an abuse of that process.[25] As to the latter determination, while it generally involves a factual issue for the jury, it may be made at the summary judgment stage provided the requisite lack of a material factual issue is shown and reasonable persons could not differ. In determining whether there was an abuse of that process, the burden of establishing the lack of good faith or the presence of malice is on the plaintiff physician. See Smith v. Our Lady of the Lake Hospital, Inc., 639 So.2d at 750.
In this case, we have determined that the Cabrini investigation of Dr. Granger’s professional conduct was taken during peer review proceedings. Further, we have found no manifest error in the jury’s finding that Cabrini’s peer review was taken with malice, not in the reasonable belief that the action was in the furtherance of quality health care, nor in the reasonable belief that the action was warranted by the known facts. Therefore, Cabrini is not entitled to immunity under LSA-R.S. 13:3715.3(0.
Even though it has been determined that Cabrini was not entitled to either HCQIA immunity or immunity pursuant to Louisiana’s peer review statute, since neither of these laws provide a cause of action for damages, a plaintiff must look to some other basis for the recovery of damages allegedly arising from peer review proceedings.[26]

*760
|s¡Louisiana Contract Law

The jury found that Cabrini failed to substantially comply with its Bylaws in the peer review proceedings and that Cabrini’s conduct caused revocation of Dr. Granger’s hospital privileges. Cabrini contends that the appellate court erred in holding that its Bylaws created an enforceable contract between the hospital and the physician members of its medical staff, which was breached, thus providing Dr. Granger with a cause of action for damages.
There is a split of authority among the nation’s courts on the question of whether bylaws can form the basis for a contractual relationship between a hospital and a physician member of its medical staff. However, the issue has uniformly been decided in accordance with applicable state contract law. See e.g. Janda v. Ma-dera Community Hospital, 16 F.Supp.2d 1181, 1184-87 (E.D.Cal.1998); Islami v. Covenant Medical Center, Inc., 822 F.Supp. 1361, 1370-71 (N.D.Iowa 1992).[27]
13!¾Under Louisiana law, the requirements for a valid contract are capacity, *761 consent, a lawful cause, and a valid object. See LSA-C.C. arts.1918, 1927, 1966, 1971; Saul Litvinoff, 5 La. Civ. L. Treatise, Law of Obligations § 2.23 (2d ed.). See also La Bo J Partnership v. Louisiana Lottery Corporation, 2008-1279 (La.App. 1 Cir. 1/30/09), 6 So.3d 191, 194, writ denied, 2009-0441 (La.4/13/09), 5 So.3d 168.
The evidence in this case reveals that an application for appointment or reappointment to Cabrini’s medical staff is governed by the Bylaws and requires the application to be submitted on forms approved by the Board. An application is obtained from and returned to Cabrini’s CEO or his des-ignee. The completed application is reviewed by the CEO, a section chief, the Credentials Committee, and by the Board (for final approval), pursuant to the Bylaws (Articles III and VI).
During the application process, extensive and detailed information is required from an applicant, as set forth in the Article IV of the Bylaws. Further, applicants are required by Article TV, Section 4.3(a)-(b) to agree to certain obligations, which include the following (among others): an agreement to abide by all hospital and medical staff bylaws, rules, regulations, and policies; an agreement to accept committee assignments and such other reasonable duties and responsibilities as shall be assigned; an agreement to provide, with or without request, new or updated information that is pertinent to any question on the | ^application form as it occurs; an agreement (expressly stated on the application form) that the applicant received, had an opportunity to read, and agreed to be bound by the Bylaws; an agreement to use the hospital and its equipment sufficiently to allow the hospital, through assessment by appropriate medical staff committees and section chiefs, to evaluate the competence of the appointee; and an agreement to participate in emergency service call rotation as defined in the rules and regulations.
In this case, Dr. Granger first sought membership in the Cabrini medical staff in 1996. In his July 1996 application, Dr. Granger agreed to the following:
In making application for appointment to the medical staff of St. Francis Cabrini Hospital, I hereby agree to abide by all policies of the hospital, including all Bylaws and Rules and Regulations of the Medical Staff, and the Ethical and Religious Directives for Catholic Health Care Facilities. I agree to cooperate in maintaining accreditation by the JCAHO, to provide for continuous care for my patients, to accept committee assignments and such other reasonable duties and responsibilities as shall be assigned.... [Emphasis added.]
After receipt, review, and approval of Dr. Granger’s first application for membership in Cabrini’s medical staff, then Chief Medical Executive Dr. Edward R. Villemez, Jr. sent Dr. Granger a letter on hospital letterhead, signed and dated December 17, 1996, stating:
I am pleased to inform you that the Local Governing Board of St. Frances Cabrini Hospital, upon the recommendations of the Credentials and Medical Executive Committees, approved your application for membership on the ... Medical Staff....
Voting rights, eligibility to hold office, and meeting attendance requirements for your medical staff membership category are outlined in the By-Laws and Rules & Regulations previously mailed to you.
Dr. Granger’s subsequent applications for reappointment to the Cabrini medical staff contained substantially the same language and were approved in a similar manner.
*762 laJn this case, under Louisiana contract law, a contract was formed that contemplated mutual obligations and mutual benefits to the parties. Obviously, Cabrini had an interest in having local physicians join its medical staff and make use of its facilities, so that it could charge fees for the services and facilities provided. Just as apparent was Dr. Granger’s interest, as a surgeon, in joining Cabrini’s medical staff so that he could have access to one of the only two hospitals in his area, as potential patients might have a preference and/or be limited by their insurance coverage in their choice between the two hospitals. The relationship presented mutual advantages to both parties; Cabrini would provide the facilities and staff that would enable Dr. Granger to conduct surgery for his patients, and both parties could bill fees for the services and/or facilities provided. Further, Cabrini made it known, through its Bylaws that membership in the medical staff could be obtained through the application procedure described therein and by the physician’s agreement to abide by the Bylaws. In promulgating the Bylaws and in accepting the applications of the physicians who sought membership in their medical staff pursuant to those Bylaws, Cabrini obviously intended to be bound by the provisions set forth therein. We conclude that the offer and acceptance between Cabrini and Dr. Granger, via the exchange of written correspondence relative to the application for and the granting of medical staff membership, viewed along with the commencement of Dr. Granger’s practice at Cabrini, established a contractual relationship between Cabrini and Dr. Granger. Further, the parties clearly intended[28] that the Bylaws would govern their relationship.[29]
l3SWe note that in Smith v. Our Lady of the Lake Hospital, Inc., without specifically being called upon to answer the question of whether there was a contract between the hospital and the physician who had been subjected to peer review pursuant to the hospital’s medical staff bylaws, this court addressed whether there had *763 been a breach of the bylaws in the conduct of the peer review. In concluding that there had been substantial compliance with the bylaws, and thus there was no breach, this court reasoned that while the bylaws may not have been strictly complied with in every instance, any alleged defects were cured by the fact that the physician had been offered review by multiple committees, adopting the “substantial compliance” rule espoused in Owens v. New Britain General Hospital, 32 Conn.App. 56, 627 A.2d 1373,1380 (1993), affirmed, 229 Conn. 592, 643 A.2d 233 (1994); Friedman v. Memorial Hospital of South Bend, Inc., 523 N.E.2d 252 (Ind.App.1988); and Even v. Longmont United Hospital Association, 629 P.2d 1100, 1102 (Colo.App.1981). See Is -¡Smith v. Our Lady of the Lake Hospital, Inc., 639 So.2d at 755-56. It was further noted that one of the purposes for bylaws is to provide procedural fairness in reaching decisions regarding staff privileges, and the proceedings must be viewed as a whole to determine whether the bylaw requirements have been substantially complied with or whether the proceedings were fatally flawed by procedural irregularities. See Smith v. Our Lady of the Lake Hospital, Inc., 639 So.2d at 756. See also Doe v. Grant, 2001-0175 (La.App. 4 Cir. 1/29/03), 839 So.2d 408, 420-21, writ denied, 2003-0604 (La.5/2/03), 842 So.2d 1102. In all of these cases it was recognized that certain requirements or obligations arose out of the hospital’s medical staff bylaws, though the existence of a contract was not discussed.
We now turn to an examination of the provisions of the Bylaws to determine which, if any, were breached as Dr. Gran-ger contends. Pursuant to Article VII of the Bylaws, an investigation may be commenced as to a member of the medical staff whenever “on the basis of information, written, oral or observed, and belief’ that there is cause to question: clinical competence; the cure or treatment of a patient or management of a case; the known or suspected violation of applicable ethical standards, bylaws, policies, rules, or regulations; or behavior or conduct that appears to be lower than the standards for a medical staff member or disruptive of the orderly operation of the hospital, including the inability of the medical staff member to work harmoniously with others.
As further provided in Article VII of the Bylaws, a request for investigation should be directed to the MEC, which is required to meet as soon as possible after receiving such a request. If sufficient information is provided, the MEC may make an immediate recommendation for action; if not, then an investigation is begun by either the MEC or a subcommittee it appoints. The full resources of the hospital and medical staff are made available to the MEC during an investigation, and the MEC is authorized to order a physical or mental examination. The individual under investigation is allowed to meet with the investigating committee before it makes its report, during which the individual must be informed of the nature of the evidence and be “invited to discuss, explain or refute it.” The MEC may accept, modify, or reject the recommendation of any subcommittee.
IssThe following actions are specifically listed in Article VII, Section 7.3, of the Bylaws as recommendations that the MEC may make: (1) that no action is justified; (2) that a written warning be issued; (3) that a letter of reprimand be issued; (4) that terms of probation be imposed; (5) that a requirement for consultation be imposed; (6) that a reduction of clinical privileges be ordered; (7) that a suspension of clinical privileges be ordered for a term; (8) that a medical staff appointment be revoked; (9) that self-referral to the PHFL be required; (10) that a mandatory *764 hospital referral to the PHFL be required; or (11) that any other recommendation as deemed necessary or appropriate be made. When any of these recommendations is under consideration, the MEC may notify the individual under investigation of the “general tenor” of the possible recommendation and ask if the individual would like to meet with the committee prior to a recommendation, pursuant to Article VII, Section 7.3(b). As stated in Article VII, Section 7.8(c), unless the action entitles the individual to a hearing, as outlined in Appendix A of the Bylaws, the recommendation may be made immediately effective, subject to final approval by the Board. If a hearing is required, the Cabrini CEO is notified and he, in turn, notifies the individual, in accordance with Article VII, Section 7.3(d).
Appendix A of the Bylaws states, in pertinent part:
An applicant or an individual holding a Medical Staff appointment shall be entitled to request a hearing whenever an unfavorable recommendation has been made by the [MEC] or the Board regarding the following:
(1) denial of initial Medical Staff appointment;
(2) denial of requested advancement in Medical Staff category;
(3) denial of Medical Staff reappointment;
(4) revocation of Medical Staff appointment;
(5) denial of requested initial clinical privileges;
(6) denial of requested increased clinical privileges;
(7) decrease of clinical privileges;
(8) suspension of total clinical privileges;
(9)imposition of mandatory concurring consultation requirement.
Is9~"
... The affected individual shall also be entitled to request a hearing before the Board enters a final decision, in the event the Board should determine, without a similar recommendation from the [MEC], to take any action set forth above.
[Emphasis added.]
Appendix A further states that “[n]o other recommendations ... shall entitle the individual to request a hearing.”
At its May 29, 2003 meeting, the MEC voted to recommend that Dr. Granger be required to self-refer to the PHFL within seven days; otherwise, there would be an automatic termination of his privileges. This action constituted an unfavorable recommendation made by the MEC regarding revocation of Dr. Gran-ger’s medical staff appointment. Thus, under Appendix A of the Bylaws (stating that “an individual holding a Medical Staff appointment shall be entitled to request a hearing whenever an unfavorable recommendation has been made by the [MEC] or the Board regarding ... revocation of Medical Staff appointment”), a hearing was obligatory, and under Article VII, Section 7.3(d), Dr. Granger was entitled to notice from the Cabrini CEO to that effect. Section 7.3(d) of the Bylaws further directs that the CEO or his designee “shall then hold the recommendation until after the individual has exercised or has waived the procedural rights as provided in ... Appendix A.” Dr. Granger was not apprised of his right to a. hearing when the MEC recommended his automatic revocation upon his failure to self-refer the PHFL. Further, as previously indicated, Cabrini had initially .summarily suspended Dr. Granger and that suspension encompassed the “total” of Dr. Granger’s clinical privi *765 leges. As indicated hereinabove, we do not modify the lower court rulings finding no damages arose out of the actual term of the summary suspension, however, we conclude that Cabrini was obligated, pursuant to Appendix A.l(a) of the Bylaws, to provide Dr. Granger with a post-suspension | ^hearing,[30] but failed to do so.[31] On these bases, we conclude that Cabrini breached its contractual obligations,[32] and we find no error in the jury’s determination that an award of damages to Dr. Granger was warranted.[33]

Negligent Misrepresentation

Cabrini also contends that the appellate court erred in finding that Dr. Granger had stated a claim for negligent misrepresentation, when there was no contract or fiduciary relationship between Cabrini and Dr. Granger and he did not rely on any alleged misrepresentation made by Cabrini to his detriment. With respect to this issue, the jury found that, in its peer review of Dr. Granger, Cabrini made negligent misrepresentations to or concerning Dr. Granger and the negligent misrepresentations caused harm to Dr. Granger.
|41The broad language of Civil Code Articles 2315 and 2316 affords protection for persons damaged by the negligent acts of others sufficient to encompass a cause of action for negligent misrepresentation. However, our jurisprudence has also limited negligent misrepresentation tort theory to cases in which a contract or fiduciary relationship exists. Daye v. General Motors Corporation, 97-1653 (La.9/9/98), 720 So.2d 654, 659.
In Louisiana, negligent misrepresentation cases are evaluated using the duty-risk analysis. The duty-risk analysis is employed on a case-by-case basis.
*766 A plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant, and the risk of harm was within the scope of protection afforded by the duty breached.[34] Generally, the initial determination in the duty-risk analysis is cause-in-fact. The inquiry to be made is whether the harm would have occurred but for the defendant’s alleged substandard conduct or, when concurrent causes are involved, whether defendant’s conduct was a substantial factor in bringing about the harm. Daye v. General Motors Corporation, 720 So.2d at 659. See also Barrie v. V.P. Exterminators, Inc., 625 So.2d 1007, 1014-16 (La.1993).
In this case, there were numerous instances of misrepresentation by Cabrini officials, who had a duty to provide correct information under the circumstances, which occurred during the peer review process.[35] Dr. Granger asserted he was [42damaged by these misrepresentations, which he claimed affected the valid functioning of the investigating committees as well as hjs decision-making process in responding to the peer review process. We conclude that the record reveals a reasonable basis for the jury’s factual findings in favor of Dr. Granger on this issue, and we find no error in the factfinder’s decision to award damages for negligent misrepresentation.

Damages

The jury found that Dr. Granger suffered $2,900,000 in past loss of income and $1,000,000 in general damages; these damage awards were reduced by the appellate court to $2,894,000 in past loss of income and $100,000 in general damages.[36] Cabrini asserts that the lower courts erred in allowing Dr. Granger to recover damages because, Cabrini claims, he made a voluntary decision to withdraw from his practice at the hospital. A second basis cited by Cabrini for invalidation of the award of damages is its assertion that Dr. Granger did not personally incur damage, rather, Cabrini contends that, since Dr. Granger’s limited liability medical corporation, CSA, was Dr. Granger’s employer and had the right to collect payment for all services he rendered, only CSA had the right to sue for lost wages, and CSA was not a party to this suit. Finding merit in the former argument, we find it unnecessary to address the latter.
As the parties stipulated, following Dr. Granger’s December 19, 2002 through January 9, 2003 summary suspension, he was restored to full medical staff privileges on January 10, 2003. Thereafter, his two-year appointment to the medical staff expired on July 31, 2003, and he did not apply for reappointment to the medical staff. Further, while the MEC, BEC, and *767 the Board voted for and/or ratified an automatic revocation of Dr. Granger’s medical staff membership and |4Sclinical privileges, Dr. Granger did not become aware of the automatic revocation until after he allowed his medical staff membership to lapse.[37]
Even though Dr. Granger did not know about Cabrini’s automatic revocation decision, he made a voluntary choice not to apply for reappointment to the medical staff by the end of his appointment on July 31, 2003. Dr. Granger quotes the Third Circuit as concluding that “the actions of Cabrini ‘placed the doctor in a position of having to allow his staff privileges to lapse or risk being rejected/’]” Dr. Granger further stated in brief to this court that to conclude that he voluntarily relinquished his clinical privileges at Cabrini “ignores the formal action taken by the Board on the recommendation for an ‘automatic’ termination of privileges.” In essence, Dr. Granger’s position is that application for reappointment would have been a vain and useless act since Cabrini had already decided to revoke his existing appointment to the medical staff.[38] We find Dr. Granger’s position unsupportable in view of his own contractual obligations under the Bylaws.
The action taken by Cabrini in July of 2003 only affected Dr. Granger’s medical staff appointment then in effect, which expired at the end of that month, and did not purport to have any effect beyond the appointment term ending in July 2003. Dr. Granger’s contract with Cabrini expired by its terms on July 31, 2003. If Dr. Granger wanted to continue his relationship with Cabrini, he was obligated, under the express provisions of the Bylaws, which we hereinabove conclude also bound Cabrini, to follow the reappointment process set forth therein.[39]
144We cannot agree, as Dr. Granger sug-. gests, that the submission of an application for reappointment would be a vain and useless act. The import of the pertinent provision of the Bylaws, in Article VI, Seetiqn 6.1, is that an application for reappointment to the medical staff is decided independently of the physician’s existing status. Section 6.1 states:
No individual shall be entitled to reappointment to the Medical Staff, or to the exercise of particular clinical privileges in the Hospital, merely by virtue of the fact that such individual (a) is licensed to practice a profession in this or any other state, (b) is a member of any particular professional organization, or (c) has had *768 in the past, or currently has, Medical Staff appointment or privileges at any Hospital.[ 40]
There is no provision in the Bylaws prohibiting a physician who does not currently hold an appointment to the medical staff, or whose membership has been revoked, from applying for appointment or reappointment.
Pursuant to Article VI, Section 6.5, of the Bylaws, the MEC must make a recommendation following review of an application for reappointment to the medical staff. If the MEC’s recommendation is to deny an application for reappointment, then the matter is transmitted to Cabrini’s CEO, who must notify the applicant of his right to a hearing and is required to “hold the recommendation until after the individual has exercised or has waived the right to a hearing.”[41] |4BThus, an initial rejection on reapplication does not become effective until after a hearing is held.
We further reject Dr. Granger’s assertion that he could not reapply because a denial of privileges is reportable and there was no doubt that his privileges would have been denied.[42] The point of contention between Cabrini and Dr. Gran-ger, between January 2003 and July 2003, was that Cabrini wanted Dr. Granger to submit to a mental status evaluation (for alleged anger issues), and Dr. Granger refused to do so. However, for either an initial application for appointment or an application for reappointment to Cabrini’s medical staff, during review of the application, an applicant may be required to submit to a physical and/or mental examination, as stated in Article IV, Section 4.6(b), and Article VI, Section 6.4(b), of the Bylaws.[43]
*769 |4fiWe conclude that the record does not establish that Dr. Granger is entitled to any lost income damages because of Cabrini’s actions. Dr. Granger does not assert that he was prevented from attending any patients at Cabrini following his reinstatement on January 10, 2008 through the date his medical staff appointment expired on July 31, 2003. Further, because the Cabrini Board did not ratify the MEC’s and BEC’s recommendations of automatic revocation of Dr. Granger’s medical staff membership until July 30, 2003 and Dr. Granger did not know about these decisions,[44] his clinical privileges were not affected. The revocation and the expiration of his medical staff membership, pursuant to its contractual term, effectively coincided. And any loss of income from Dr. Granger’s lack of medical staff membership at Cabrini after his membership term expired on July 31, 2003 resulted from Dr. Granger’s failure to reapply for medical staff membership, rather than from any action by Cabrini. To the extent the jury found as a matter of fact that Dr. Gran-ger’s loss of income from a Cabrini practice was caused by Cabrini, such a factual finding of causation was manifestly erroneous.[45] Accordingly, the award of lost income to Dr. Granger was in error and will be vacated.

Relief Sought by Dr. Granger

|47In his brief to this court, Dr. Granger asks that the Third Circuit’s opinion be reversed on the claims of defamation and fraud, and the case be remanded to the trial court for an award of attorney’s fees, in accordance with LSA-C.C. art. 1958. Dr. Granger is, thus, asking this court to change the lower court rulings, which did not provide the relief he now seeks.
The judgment of a court of appeal becomes final and definitive if neither an *770 application to the court of appeal for rehearing, nor an application to the supreme court for a writ of certiorari, is timely filed. LSA-C.C.P. art. 2166. See also St. Bernard Police Jury v. Muría, 2000-0132 (La.6/30/00), 761 So.2d 532, 534; Roger v. Estate of Moulton, 513 So.2d 1126, 1134 (La.1987).
In appellate practice it is a general principle that a party may not seek to change the judgment below, or any part thereof, unless he has appealed or petitioned for review. This is true whether a party seeks to revive a separate claim rejected by the court below, increase the amount awarded on the claim that is the subject of the appeal, increase the scope of equitable relief, or seek incidental relief as to interest, attorney’s fees, statutory penalties, or costs. An argument that would modify the judgment below, even in a way that would provide less relief, cannot be presented without filing an appeal or petition. This principle applies equally to appeals and review by certiorari. When a writ of certiorari or review is granted at the instance of one of the parties to a suit, to consider a complaint of a judgment of the court of appeal, an opposing party to the suit, who has not applied for a writ of review, cannot have the judgment amended for his benefit. In such cases, the judgment of this court will be confined to the complaint or complaints of the party or parties at whose instance the writ of review was granted.[46] Roger v. Estate of \iJMoulton, 513 So.2d 1126, 1135-36 (La. 1987) (on rehearing). See also Mosing v. Domas, 2002-0012 (La.10/15/02), 830 So.2d 967, 977; Matthews v. Consolidated Companies, Inc., 95-1925 (La.12/8/95), 664 So.2d 1191, 1192 n. 6; Piper v. Olinde Hardware & Supply Company, 288 So.2d 626, 628 (La.1974); Logan v. Louisiana Dock Company, 541 So.2d 182, 192 (La. 1989) (on rehearing); Logan v. Louisiana Dock Company, 543 So.2d 1336, 1337 (La. 1989) (Lemmon, J., concurring in the decision on partial rehearing).
In this case, Dr. Granger did not apply for a writ of certiorari and/or review from this court. Therefore, the lower court rulings he now complains of became final and definitive, and we cannot change the rulings of the lower court in his favor.
1 ^CONCLUSION
After review of the record presented in this case, we affirm the Third Circuit decision, insofar as it: held that Cabrini was not entitled to immunity under either HCQIA or Louisiana’s peer review statute; upheld the trial court finding that Cabrini and Dr. Granger had a contractual relationship, which was governed by the Bylaws; and upheld the trial court’s award of general damages to Dr. Granger for breach of that contract and for the negligent misrepresentation by Cabrini officials. However, we reverse the decision to award damages for lost income and vacate that award.
DECREE
For the reasons assigned and as stated herein, we affirm in part and reverse in part the judgment rendered in favor of the plaintiff, Tommie M. Granger, M.D.; the *771 award of $2,894,000 in lost income is hereby vacated.
AFFIRMED IN PART; REVERSED IN PART; AWARD OF LOST INCOME VACATED.
VICTORY, Justice, concurs.
GUIDRY, Justice, concurs.

. Initially, this patient underwent a cardiac catheterization (“heart cath”), performed by his cardiologist, Dr. Robert J. Freedman, Jr. As a result of the heart cath, the patient was diagnosed with coronary artery disease, which warranted coronary bypass surgery. The patient was referred to Dr. Granger for surgery. In order to assure the best outcome of the coronary bypass surgery, it was deemed necessary to first perform a carotid endarter-ectomy to remove a blockage of the patient's carotid artery. The carotid endarterectomy was performed by Dr. Granger on December 16, 2002, and it was this surgical site over *741 which a hematoma subsequently developed, culminating in emergency interventions on December 18, 2002.

. Although there is a gap in the handwritten nursing notes introduced into evidence, and these notes do not contain the handwritten nurse’s notes for the pertinent time period (after 6:00 p.m. on December 17, 2002 through 3:00 p.m. on December 18, 2002), the following facts can be gleaned from the transcribed nursing records and witnesses’ testimony. The patient’s carotid endarterec-tomy was performed at approximately 3:15 p.m. on December 16, 2002. On December 17, 2002, at 8:00 p.m., the nursing staff noted swelling and a small amount of bloody drainage at the surgical site. At 10:00 p.m. and at midnight, a decreased amount of swelling was noted, but an increase in bloody drainage was recorded (a "moderate” amount). At 2:00 a.m. on December 18, 2002, swelling continued to be noted, along with a moderate amount of bloody drainage. At 3:00 a.m., Dr. Granger was called and informed by the nursing staff of "bladder distention” in the patient and also of "drainage from right neck incision.” Dr. Granger testified that he was not notified of, and the transcribed nursing notes do not indicate Dr. Granger was notified of, any swelling at the incision site, though the nursing notes continued to note that there was swelling at the incision site. Dr. Granger testified that he instructed the nurse who called him to contact him if any swelling or respiratory distress developed. At 4:00 a.m., the nursing notes again recorded the presence of swelling at the surgical site, but there was a "significant decrease” in drainage. At 4:35 a.m., Dr. Henry G. Hanley (who was a partner of Dr. Freedman in the practice of cardiology) was called, and the nursing staff spoke with "Shane Cole,” who was on call, regarding a return of nausea in the patient. However, there was no indication that any further attempt was made by the nursing staff to contact Dr. Granger on December 18, 2002, even though swelling at the surgical site was noted at 7:35 a.m. and 1:00 p.m. (There was some indication in the record that Cabrini nurses were hesitant to telephone Dr. Gran-ger.) At 2:15 p.m., the nursing records reflect that a report was made to Dr. Freedman, who was present in the hospital making rounds, that the patient was experiencing nausea. However, Dr. Freedman testified that the nurses had expressed concern to him about swelling in the patient’s neck over the surgical site. Dr. Freedman further testified that the patient complained of difficulty breathing, and he discovered a "moderately large hema-toma” (which he indicated was a collection of blood under the skin over the carotid artery incision site) at the surgical site. Dr. Freedman felt that there was "potential for a problem to occur in the not too distant future.” Dr. Freedman expressed the opinion that the nursing staff should have called Dr. Granger when the condition was first noticed, as bleeding within the neck can compromise a patient's airway. Dr. Freedman called Dr. Granger, who said he would come right over. At the time he received Dr. Freedman’s call, Dr. Granger was at Rapides, where he had a surgical patient who had just been placed under anesthesia in preparation for a surgery he was scheduled to perform. Upon hearing about his Cabrini patient’s condition, Dr. Granger left his Rapides patient anesthetized and drove immediately to Cabrini.

. Ultimately, the bypass surgery was not performed, and the patient later died.

. The PHFL is an organization providing confidential assistance to physicians suffering from substance abuse, depression, anxiety, or other disruptive behavioral patterns.

. In ruling on the damage awards, the appellate court rejected Cabrini’s argument that Dr. Granger's limited liability company was the proper party plaintiff to recover surgical fees, finding instead that Dr. Granger’s tort claims against Cabrini were based on injuries he personally suffered and that his contract claims were based on a contract with Cabrini, to which his limited liability company was not a party.

. We note that this court previously reviewed HCQIA, in Smith v. Our Lady of the Lake Hospital, Inc., wherein it was determined that the factual circumstances at issue arose prior to the implementation of HCQIA in Louisiana, and, therefore, the Act was not applicable in that case. The United States Supreme Court has not yet squarely addressed HCQIA, mentioning the Act in only two cases, in both of which the main issues revolved around the Sherman Antitrust Act. See Patrick v. Burget, 486 U.S. 94, 106 n. 8, 108 S.Ct. 1658, 1665 n. 8, 100 L.Ed.2d 83 (1988) (wherein it was held that HCQIA could not be retroactively applied to the events in that case, which arose prior to its promulgation; however, the Court stated, in general, that the Act essentially immunizes peer review action from liability if the *748 action was taken in the reasonable belief that it was in the furtherance of quality health care); and Summit Health, Ltd. v. Pinhas, 500 U.S. 322, 332 n. 12, 111 S.Ct. 1842, 1848 n. 12, 114 L.Ed.2d 366 (1991) (wherein it was noted that the Act provided for immunity from antitrust and other actions only if the peer review process was conducted in accordance with the Act, further noting that the immunity provisions do not protect illegitimate actions taken under the guise of furthering the quality of health care, such as actions that are really taken for anticompetitive purposes).

. A "professional review body” is "a health care entity and the governing body or any committee of a health care entity which conducts professional review activity, and includes any committee of the medical staff of such an entity when assisting the governing body in a professional review activity." 42 U.S.C.A. § 11151(11). A "health care entity” includes a “hospital that is licensed to provide health care services by the State in which it is located.” 42 U.S.C.A. § 11151(4).

. An action is not considered to be based on the competence or professional conduct of a physician if the action is primarily based on: (1) the physician’s association, or lack of association, with a professional society or association; (2) the physician’s fees or the physician’s advertising or engaging in other competitive acts intended to solicit or retain business; (3) the physician's participation in prepaid group health plans, salaried employment, or any other manner of delivering health services whether on a fee-for-service or other basis; (4) a physician's association with, supervision of, delegation of authority to, support for, training of, or participation in a private group practice with, a member or members of a particular class of health care practitioner or professional; or (5) any other matter that does not relate to the competence or professional conduct of a physician. 42 U.S.C.A. § 11151(9).

.Notice and hearing procedures are set forth in 42 U.S.C.A. § 11112(b), which provides:
Adequate notice and hearing A health care entity is deemed to have met the adequate notice and hearing requirement of subsection (a)(3) of this section with respect to a physician if the following conditions are met (or are waived voluntarily by the physician):
(1) Notice of proposed action The physician has been given notice stating—
*749 (A)(i) that a professional review action has been proposed to be taken against the physician,
(ii)reasons for the proposed action,
(B)(i) that the physician has the right to request a hearing on the proposed action,
(ii) any time limit (of not less than 30 days) within which to request such a hearing, and
(C) a summary of the rights in the hearing under paragraph (3).
(2) Notice of hearing
If a hearing is requested on a timely basis under paragraph (1)(B), the physician involved must be given notice stating—
(A) the place, time, and date, of the hearing, which date shall not be less than 30 days after the date of the notice, and
(B) a list of the witnesses (if any) expected to testify at the hearing on behalf of the professional review body.
(3) Conduct of hearing and notice
If a hearing is requested on a timely basis under paragraph (1)(B)—
(A) subject to subparagraph (B), the hearing shall be held (as determined by the health care entity)—
(i) before an arbitrator mutually acceptable to the physician and the health care entity,
(ii) before a hearing officer who is appointed by the entity and who is not in direct economic competition with the physician involved, or
(iii) before a panel of individuals who are appointed by the entity and are not in direct economic competition with the physician involved;
(B) the right to the hearing may be forfeited if the physician fails, without good cause, to appear;
(C) in the hearing the physician involved has the right—
(i) to representation by an attorney or other person of the physician’s choice,
(ii) to have a record made of the proceedings, copies of which may be obtained by the physician upon payment of any reasonable charges associated with the preparation thereof,
(iii) to call, examine, and cross-examine witnesses,
(iv) to present evidence determined to be relevant by the hearing officer, regardless of its admissibility in a court of law, and
(v) to submit a written statement at the close of the hearing; and
(D) upon completion of the hearing, the physician involved has the right—
(i) to receive the written recommendation of the arbitrator, officer, or panel, including a statement of the basis for the recommendations, and
(ii) to receive a written decision of the health care entity, including a statement of the basis for the decision.
A professional review body’s failure to meet the conditions described in this subsection shall not, in itself, constitute failure to meet the standards of subsection (a)(3) of this section.

. This conclusion is evident from the wording of 42 U.S.C.A. § 11112(c)(2), which reads: "For purposes of section 11111(a) of this title, nothing in this section shall be construed as ... precluding an immediate suspension or restriction of clinical privileges, *750 subject to subsequent notice and hearing or other adequate procedures, where the failure to take such an action may result in an imminent danger to the health of any individual.” (Emphasis added.) See also Poliner v. Texas Health Systems, 537 F.3d at 383 (which involved a cardiac surgeon who had been suspended based on competency issues and provided a post-suspension hearing; it was concluded that the surgeon had “received the ‘subsequent notice and hearing or other adequate procedures’ that [Section 11112(c)(2) ] contemplates”).

. Immunity is also extended to: any person acting as a member or staff to the professional review body; any person under a contract or other formal agreement with the professional review body; and any person who participates with or assists the professional review body with respect to the action. See 42 U.S.C.A. § 11111.

. Section 7.5(a) of the Bylaws stated that a medical staff member may be summarily suspended "whenever failure to take such action may result in an imminent danger to the health and/or safety of any individual.”

. Dr. Patton was involved in the decision, along with his partner, Dr. Frances Robi-chaux, to cancel Dr. Granger’s patient’s coronary bypass surgery previously scheduled for the following day, December 19, 2002, due to the patient’s weakened condition resulting from the bleeding issues he suffered on December 18, 2002.

. Section 7.3(c) of the Bylaws stated: If the action of the [MEC] does not entitle the individual to a hearing, as outlined in A. 1(a) of Appendix A, the action shall be effective immediately subject, however, to final approval by the Board. There shall be no right of appeal to the Board. A report of the action taken and reasons therefor shall be made to the Board through the Chief Executive Officer [ ("CEO”) ] or designee and the action shall stand unless modified by the final approval of the Board.

. The emphasized text did not appear in the actual resolution adopted by the BEC, as reflected in the BEC’s March 10, 2003 minutes; the actual wording of the BEC resolution was as follows:
RESOLVED, as recommended by the [MEC], that Dr. T. Mack Granger be requested to self-refer to the [PHFL] within 30 days for evaluation, or risk consideration of further action; and, that Dr. Granger be placed on probation for a period of six months, is hereby ratified and approved by the members of the [BEC].

. The April 30, 2003 Board minutes quoted from both the March 10, 2003 BEC resolution and the April 7, 2003 letter sent to Dr. Gran-ger; however, the resolution passed by the Board only specifically approved the former and not the latter, stating:
RESOLVED, that the recommendations of the [MEC] and the [BEC], as stated in the March 10, 2003 minutes of the [BEC], are hereby ratified and adopted by the [Board],
The implication in the Board’s adoption of the March 10, 2003 BEC minutes, containing the BEC resolution that only obligated Dr. Gran-ger to self-refer "for evaluation” and not expressly approving the April 7, 2003 letter that compelled Dr. Granger to engage in "treat-mtent for anger management,” is that the former was adopted, but not the latter.

. Despite the Board’s July 30, 2003 minutes stating that Dr. Granger’s privileges expired that day and that he had not reapplied, Dr. Granger’s privileges did not expire until the next day, on July 31, 2003, as provided in the October 8, 2001 Cabrini CEO letter informing him that his medical staff reappointment was "for the period of August 1, 2001 to July 31, 2003.”

. As we discuss hereinafter, a judgment of an appellate court becomes final and definitive, if, upon the conclusion of that proceeding, no application is made to the supreme court for a writ of certiorari, pursuant to LSA-C.C.P. art. 2166. Although Cabrini successfully applied for review by this court, Dr. Granger did not. See LSA-C.C.P. art. 2166(D) (stating that when a party files a timely application for a writ of certiorari to the supreme court, within the delays provided in Article 2166, any other party may also apply for certiorari to the supreme court within thirty days of the transmission of the notice of judgment of the court of appeal or within ten days of the transmission by the supreme court clerk of the notice of first application for certiorari in the case, whichever is later).

. We note that the appellate court nevertheless ruled that evidence of the factual circumstances surrounding the initial summary suspension was appropriately presented to the jury as part of the "relevant overall evidentia-ry scenario.” See Granger v. Christas Health Central Louisiana, 97 So.3d at 638.

. Even under the "imminent danger” exception, set forth in Section 111 12(c)(2), an entity conducting peer review is required to grant a physician due process protections "at some point.” See Johnson v. Spohn, 334 Fed.Appx. 673, 682 (5th Cir.2009) (wherein the physician had been permitted to speak before the reviewing committee, but he had not been afforded the right to counsel or any other procedural protections at that time).

. As stated hereinabove, to be entitled to HCQIA immunity, Section 11112(a) imposes four requirements, stating that a professional review action must be taken: (1) in the reasonable belief that the action was in the furtherance of quality health care; (2) after a reasonable effort to obtain the facts of the matter; (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances; and (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

. "Adversely affecting” is defined by HCQIA as including "reducing, restricting, suspending, revoking, denying, or failing to renew clinical privileges or membership in a health care entity.” See 42 U.S.C.A. § 11151(1). It should also be noted that Section 11151(9) includes within the term "professional review action” both an "action” and a "recommendation,” and includes a decision not to take an "action” or a "recommendation.” Further, as we conclude, all professional review activity related to a professional review action is encompassed by any immunity accorded to the professional review action.

. The Smith court further held that the two statutory qualifications on immunity ("without malice” and "in the reasonable belief that such action or recommendation is warranted by the facts known”) must be read together and are not separate and distinct. Thus, the Smith court construed both of these qualifications to mean the peer reviewer must be in "good faith" to be entitled to statutory immunity. See Smith v. Our Lady of the Lake Hospital, Inc., 639 So.2d at 748.

. Such action or recommendation should also be taken "within the scope of the functions of such committee.” See Driscoll v. Stucker, 2004-0589 (La.1/19/05), 893 So.2d 32, 46.

.HCQIA does not provide a private cause of action to an aggrieved physician for actions taken in a peer review. See Brintley v. St. Mary Mercy Hospital, 904 F.Supp.2d 699, 741 (E.D.Mich.2012). See also Morris v. Emory Clinic, Inc., 402 F.3d 1076, 1083 (11th Cir. 2005); Singh v. Blue Cross/Blue Shield of Massachusetts, Inc., 308 F.3d 25, 45 n. 18 (1st Cir.2002); Wayne v. Genesis Medical Center, 140 F.3d 1145, 1148 (8th Cir. 1998); Bok v. Mutual Assurance, Inc., 119 F.3d 927, 928-29 (11th Cir. 1997) (per curiam), cert, denied, 523 U.S. 1118, 118 S.Ct. 1796, 140 L.Ed.2d 937 *760 (1998); Hancock v. Blue Cross-Blue Shield of Kansas, Inc., 21 F.3d 373, 374-75 (10th Cir. 1994). See also LSA-R.S. 13:3715.3(C), which provides only that "[n]o member of any such committee ... conducting its review [in good faith] shall be liable in damages,” but does not set forth any circumstances in which liability for damages would attach.

. The following jurisdictions have held that bylaws are binding enforceable contracts between a hospital and its medical staff: Virma-ni v. Presbyterian Health Services Corp., 127 N.C.App. 71, 77, 488 S.E.2d 284, 288 (N.C.App.1997); Houston v. Intennountain Health Care, Inc., 933 P.2d 403, 407-08 (Utah Ct.App.1997); Gonzalez v. San Jacinto Methodist Hospital, 880 S.W.2d 436, 439 (Tex.App.Texarkana 1994); Lewisburg Community Hospital v. Alfredson, 805 S.W.2d 756, 759 (Tenn.1991); Balkissoon v. Capitol Hill Hospital, 558 A.2d 304, 308 (D.C.1989); Par-iserv. Christian Health Care Systems, Inc., 816 F.2d 1248, 1251 (8th Cir.1987); Lawler v. Eugene Wuesthoff Memorial Hospital Association, 497 So.2d 1261, 1264 (Fla.Dist.Ct.App. 1986); Munoz v. Flower Hospital, 30 Ohio App.3d 162, 507 N.E.2d 360, 364-65 (1985); Anne Arundel General Hospital, Inc. v. O'Brien, 49 Md.App. 362, 370, 432 A.2d 483, 488 (1981); Miller v. Indiana Hospital, 277 Pa.Super. 370, 375, 419 A.2d 1191, 1193 (1980); McElhinney v. William Booth Memorial Hospital, 544 S.W.2d 216, 218 (Ky.1976); St. John’s Hospital Medical Staff v. St. John Regional Medical Center, Inc., 90 S.D. 674, 680-81, 245 N.W.2d 472, 475 (1976); Berberi-an v. Lancaster Osteopathic Hospital Association, Inc., 395 Pa. 257, 262, 149 A.2d 456, 458 (1959). The following jurisdictions have held that bylaws do not create a contract per se between a hospital and its medical staff: Brintley v. St. Maiy Mercy Hospital, 904 F.Supp.2d at 720-21; Wahi v. Charleston Area Medical Center, 453 F.Supp.2d 942, 956 (S.D.W.Va.2006), affirmed, 562 F.3d 599 (4th Cir.2009), cert, denied, 558 U.S. 1158, 130 S.Ct. 1140, 175 L.Ed.2d 991 (2010); Janda v. Madera Community Hospital, 16 F.Supp.2d at 1185; Zipper v. Health Midwest, 978 S.W.2d 398, 415-16 (Mo.App. W.D.1998); Gianetti v. Norwalk Hospital, 211 Conn. 51, 57-60, 557 A.2d 1249 (1989); Robles v. Humana Hospital Cartersville, 785 F.Supp. 989, 1000-02 (N.D.Ga.1992). Cabrini particularly points to decisions of other jurisdictions, holding that bylaws do not form the basis for a contract between a hospital and its medical staff, which reason that, based on statutory authority in those states requiring hospitals to enact bylaws, the contractual element of "consideration” was lacking, and therefore no contractual agreement was found in those cases. Further, Cabrini cites 48 La. Admin. Code § 9321 as imposing a similar requirement on Louisiana hospitals. However, 48 La. Admin. Code § 9321 was not enacted until November of 2003, so it was not in effect at the time this dispute arose. See La. Register, Vol. 29, No. 11, p. 2406 (Nov. 20, 2003). Moreover, in Louisiana, the common law tradition that requires "consideration” to effect an enforceable contract has not been adopted; "cause” is sufficient for a party to enter into a contract. See Aaron & Turner, L.L.C. v. Ferret, 2007-1701 (La.App. 1 Cir. 5/4/09), 22 So.3d 910, writ denied, 2009-1148 (La. 10/16/09), 19 So.3d 476.

. Interpretation of a contract is the determination of the common intent of the parties. LSA-C.C. art.2045. See also Clovelly Oil Co., LLC v. Midstates Petroleum Co., LLC, 2012-2055 (La.3/19/13), 112 So.3d 187, 192.

. We distinguish McPherson v. Cingular Wireless, LLC, 2007-0462 (La.App. 3 Cir. 10/3/07), 967 So.2d 573, 577, cited by Cabrini. McPherson holds only that an employment manual or handbook cannot change the character of the employer/employee relationship from "at will” employment to some other contractual term of employment. An employer/employee relationship obviously comprehends a contract of employment, though it may be verbal and the term of employment may be "at will.” Thus, an employment manual or handbook, which governs other aspects of the employer/employee relationship, most notably benefits, cannot alter terms of employment established outside such a document, such as the duration of the relationship. However, it should be noted that employment benefits delineated in an employment manual or handbook are considered as being governed by those provisions. See Wyatt v. Avo-yelles Parish School Board, 2001-3180 (La. 12/4/02), 831 So.2d 906; Beard v. Summit Institute of Pulmonary Medicine & Rehabilitation, 97-1784 (La.3/4/98), 707 So.2d 1233. This court has observed that when an employer promises a benefit to an employee, and the employee accepts by actions meeting the expressed conditions, the result is not a mere gratuity or illusory promise but a vested right in the employee to the promised benefit. Knecht v. Board of Trustees for State Colleges and Universities and Northwestern State University, 591 So.2d 690, 694-95 (La.1991). Thus, this line of cases, rather than contradicting Dr. Granger's claim that the provisions of the Bylaws, in this .case, govern the aspects of the Cabrini/medical staff relationship addressed therein (particularly, that the medical staff is contractually entitled to the procedural protections set forth therein applicable to peer review), actually lends support to Dr. Granger’s position.

. Nothing in Sections 7.5(a)-7.7 (applicable to an "imminent danger” suspension) supersedes the requirement of a hearing for the "suspension of total clinical privileges” otherwise required by Appendix A. 1(a).

. Although other defects in the peer review process were asserted by Dr. Granger, particularly with respect to the issue of notice, we find it unnecessary to address additional matters, having found sufficient bases for the denial of statutory immunity and for the damage award made by the jury in the denial of a requisite hearing and in the negligent misrepresentations made by defendant's management personnel.

. We reject Cabrini’s argument that Dr. Granger waived any entitlement to damages resulting from any breach of the Bylaws, since the Bylaws provide, in Article VIII, entitled "Immunity and Confidentiality,” as follows: "To the fullest extent permitted by the law, the applicant or appointee releases from any and all liability, and extends absolute immunity to the Hospital ... with respect to any acts, ... recommendations or disclosures involving the applicant or appointee, concerning the following ... proceedings for ... revocation of Medical Staff appointment, or any other disciplinary action.” This advance waiver of liability, under the present circumstances, runs afoul of LSA-C.C. art.2004 and is therefore invalid. Article 2004 provides in pertinent part: "Any clause is null that, in advance, excludes or limits the liability of one party for intentional or gross fault that causes damage to the other party.”

.While some out-of-state decisions make a distinction between hospital bylaws and medical staff bylaws, which may in some instances affect resolution of a contract issue, it is clear that language of the hospital’s medical staff bylaws in this case created binding contractual obligations between Cabrini and its medical staff appointees. In this respect, we particularly note Article VIII, Section 8.3, of the Bylaws, under the heading of "Peer Review Protection,” providing that "the committees and/or panels charged with making reports, findings, recommendations or investigations ... shall be considered to be acting on behalf of the Hospital and its Board when engaged in such professional review activities, and thus shall be deemed to be professional review bodies’ as that term is defined in [HCQIA].”

. As stated in Barrie v. V.P. Exterminators, Inc., 625 So.2d 1007, 1015 (La.1993), there must be a legal duty on the part of the defendant to supply correct information, there must be a breach of that duty, and the breach must have caused plaintiff damage.

. Some of these instances include: that Dr. Granger was not timely informed that his behavior was under consideration as a factor in the Cabrini investigation; that Dr. Granger was told that he was not entitled to a hearing under the Bylaws when he was entitled to a hearing; that correspondence was directed to Dr. Granger by Cabrini officials indicating that he was being required to engage in anger management “treatment” when the recommendation was only that he submit himself for an "evaluation”; and that Dr. Granger was not told that, if he failed to obtain the anger management evaluation, there would be an automatic revocation of his clinical privileges at Cabrini.

.The amount of damages awarded was not contested in Cabrini's writ application; only the underlying bases for rendition of the damage awards are at issue herein.

. Dr. Granger admits in brief to this court that his privileges lapsed on "July 30, 2003 [sic]" and "[o]n that same day, unbeknownst to Dr. Granger, the full Board ratified both the MEC’s recommendation for automatic revocation and the vote of the [BEC] approving that recommendation.... Thus, the last formal action of the full Board was a resolution that effectively revoked Dr. Granger's privileges without his knowledge.”

. Dr. Granger also asserts that Cabrini's argument that he voluntarily allowed his privileges to lapse ignores the jury’s factual finding that Cabrini’s actions caused him to lose his privileges. However, as we state hereinafter, the jury erred in ruling in Dr. Granger’s favor on the issue of causation.

.The Bylaws state, in Article VI, Section 6.1(a), that:
Each current appointee who is eligible to be reappointed to the Medical Staff, shall be responsible for completing the reappointment application form approved by the Board.... The reappointment application shall be submitted to the Chief Executive Officer or designee prior to the expiration of the appointee’s current appointment period. Failure to submit an application ■will result in automatic expiration of the appointee’s appointment and clinical privileges at the end of the then current Medical Staff appointment period. [Emphasis added.]

. Article III, Section 3.3, of the Bylaws contains substantially the same language, which is made applicable to initial applications for appointment to the medical staff.

. Appendix A also expressly lists the "denial of Medical Staff reappointment” as giving the applicant a right to a hearing "prior to a final decision of the Board.” See Appendix A, Sections A. 1(a)(3) and B.l(a). Further, pursuant to Appendix A, Section B.5(a), the hearing panel is required be composed of medical staff members who have not actively participated in the consideration of the matter involved at any previous level, and any individual who is in direct economic competition with, professionally associated with, or related to the affected person, is prohibited from serving on the hearing panel.

. Under HCQIA, medical entities are required to submit to a clearinghouse (the National Practitioner Data Bank, an online-database created by and under the control of the Department of Health and Human Services to share information on doctors who have adverse employment actions taken against them) certain information concerning the professional competence and conduct of health care practitioners in their employ (though clearinghouse data is only accessible to authorized medical health entities and professionals). See Zheng v. Quest Diagnostics, Inc., 248 Fed. Appx. 416, 417 (3rd Cir.2007). Prior to admitting a physician to its staff, a hospital must obtain that physician's records from the clearinghouse. These reporting requirements were designed to restrict the ability of incompetent physicians to move from state to state without disclosure or discovery of the physician's previous damaging or incompetent performance. Congress recognized that physicians faced with disciplinary action, no longer able to hide their previous discipline, would feel compelled to challenge any action taken against them in the courts. Accordingly, the reporting requirements increased the need to protect peer review participants from liability. Pursuant to 42 U.S.C.A. § 11111(b), the Secretary of Health and Human Services may, following an investigation, publish in the Federal Register the name of a health care entity that has failed to comply with these reporting requirements; a hospital so identified then loses the protection of HCQIA immunity provisions for three years. Biyan v. James E. Holmes Regional Medical Center, 33 F.3d at 1322 n. 2. See also 42 U.S.C.A. §§ 11133-35.

.Dr. Granger’s refusal to submit himself for the requested mental status evaluation (on the *769 issue of anger management), during Cabrini’s investigation of the December 18, 2002 events involving the care of Dr. Granger’s Cabrini patient, was a breach of the Bylaws' Section 4.3(a) requirement that, upon request, a medical staff appointee provide “new or updated information that is pertinent to any question on the application form.” Information on an applicant’s mental health is an item of information required on the application form (as stated in Section 3.2 of the Bylaws, for a medical staff membership, an applicant must "possess good reputation and character, including the applicant’s physical health and mental and emotional stability,” and Section 4.2 requires that the applicant provide information on his “physical and mental health” in connection with his application). Further, as part of any investigation, the investigative committee “may ... require a physical and mental examination of the individual being investigated.” Based on these provisions, we conclude that a Cabrini medical staff member must provide new or updated information on his mental or emotional stability upon request by Cabrini, which Dr. Granger failed to do.

. Dr. Granger stated in brief to this court that he did not know about Cabrini's decision to automatically revoke his medical staff membership until shortly before the 2010 trial in this matter.

. As Cabrini points out the damages awarded were segregated into only two categories: (1) past lost income; and (2) general damages. Since both the trial court and the appellate court ruled that no damages were recoverable for the December 19, 2002 through January 9, 2003 summary suspension, though for different reasons, none of the damages awarded were for this time period. Further, since Dr. Granger’s clinical privileges were restored, effective January 10, 2003, and were thereafter unrestricted throughout the contract term for which Dr. Granger was appointed, which expired at the end of July 2003, Dr. Granger was free to practice at Cabrini during that time and could not have lost any income until after July 31, 2003. Because we conclude Dr. Granger’s inability to practice at Cabrini after July 2003 was solely due to his failure to apply for reappointment to the hospital’s medical staff, any loss of income he could have earned at Cabrini was caused by his own actions, not those of Cabrini.

. We note, however, that a party who is satisfied with a judgment, and who does not file a notice of appeal or a petition for review, is still a party to the appeal or review whose arguments must be heard, and, in support of the judgment in his favor, he may present any argument supported by the record, whether it was ignored or rejected by the court below. In other words, if a party seeks to raise issues that call for a change in the judgment below, he must file an appeal or petition, but if he merely makes alternative arguments in support of the judgment, he need not. Roger v. Estate of Moulton, 513 So.2d at 1136.